| | | |
|---|---|---|
| Bennie Sisto, as the Trustee of Goat Island Realty Trust | : | No. 2011-30-Appeal. |
| | : | (NC 08-119) |
| v. | : | |
| America Condominium Association, Inc., et al. | : : | |

| | | |
|---|---|---|
| Bennie Sisto, as the Trustee of Goat Island Realty Trust | : : | No. 2011-31-Appeal. No. 2011-32-Appeal. |
| | | (NC 08-400) |
| v. | : | |
| Capella South Condominium Association, Inc., et al. | : : | |

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

| | | |
|---|---|---|
| Bennie Sisto, as the Trustee of Goat Island Realty Trust | : | No. 2011-30-Appeal. |
| | : | (NC 08-119) |
| v. | : | |
| America Condominium Association, Inc., et al. | : | |
| | : | |

| | | |
|---|---|---|
| Bennie Sisto, as the Trustee of Goat Island Realty Trust | : | No. 2011-31-Appeal. |
| | : | No. 2011-32-Appeal. |
| | | (NC 08-400) |
| v. | : | |
| Capella South Condominium Association, Inc., et al. | : | (Concurrence and Dissent |
| | : | begin on Page 22) |

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Justice Indeglia, for the Court.** In this property dispute, Bennie Sisto (Sisto or plaintiff) appeals from two judgments of the Superior Court: (1) the granting of summary judgment in favor of the defendant, America Condominium Association, Inc. (America); and (2) the granting of summary judgment in favor of the defendants, Capella South Condominium Association, Inc. (Capella), Harbor Houses Condominium Association, Inc. (Harbor Houses), and Goat Island South Condominium Association, Inc. (GIS). Additionally, Harbor Houses (a nominal defendant in the second action) appeals from the Superior Court's grant of summary judgment in that action, arguing that judgment should have been granted in Sisto's favor. All three of these appeals have been consolidated by this Court. After reviewing the record and considering the

parties' written submissions and oral arguments, we vacate in part and affirm in part the judgments of the Superior Court.

# I

## Facts and Travel

Sisto is the owner of a condominium unit located on Goat Island in Newport, within the approximately twenty-three-acre waterfront Goat Island South Condominium community. That community was created in 1988 by a master declaration of condominium; this declaration has since been amended from time to time, and was adopted in its current form in August 2007. Goat Island South Condominium is comprised of three sub-condominium residential areas—Harbor Houses Condominium, America Condominium, and Capella South Condominium. Of the 154 total units, there are nineteen stand-alone townhouse residence units located in Harbor Houses Condominium, forty-six residence units in America Condominium, and eighty-nine residence units in Capella South Condominium. Each of these sub-condominiums is governed by a separate association and declaration and must also adhere to the provisions of the master declaration. Likewise, these declarations must comply with Rhode Island's Condominium Act, G.L. 1956 chapter 36.1 of title 34 (the Condominium Act or Act).[1]

Sisto owns Unit No. 1 in Harbor Houses Condominium, which is a stand-alone townhouse unit surrounded by a yard. According to §§ 1.16 and 2.3(a) of the Harbor Houses declaration, the yard surrounding Sisto's unit is designated as a limited common element—meaning that it is "reserved for the use by one or more but fewer than all [u]nits, and intended for the exclusive use of such [u]nits."

---

[1] According to G.L. 1956 § 34-36.1-1.02(a)(1), the Condominium Act "applies to all condominiums created within [Rhode Island] after July 1, 1982 * * *."

In October 2006, Sisto filed an application with the Coastal Resources Management Council (CRMC) for approval to demolish his existing unit and rebuild a larger dwelling thereon.[2]  Subsequently, on January 16, 2007, America submitted a letter to the CRMC, objecting to that application.  In this correspondence, America stated that Sisto "does not own the land on which he wants to expand"; as such, it continued, his proposed expansion would "deprive * * * the other unit owners [in the Goat Island South Condominium community] of [their] property."  In that letter, America also stated that Sisto's planned expansion did not conform to the CRMC's setback requirements.  Later that year, after Sisto amended his application, America and Capella wrote another letter to the CRMC, on November 26, 2007, objecting on the same grounds.

Subsequently, on December 7, 2007, GIS sent a letter to the CRMC, stating that America's letter to the CRMC (in which it stated that Sisto did not own the land over which he wanted to expand) was "deceptive" because Sisto, as "one of the owners-in-common of the land underlying his proposed expansion," had the "affirmative right" to expand his unit so long as he met the requirements set forth in both the master and Harbor Houses declarations.  In a letter dated January 17, 2008, the CRMC then advised Sisto that it "lack[ed] the jurisdiction to resolve the ownership issue * * *, and [that] resolution [would] be required prior to * * * processing [Sisto's] requested application [for expansion]."  Two months after its initial letter to the CRMC, America sent a follow-up letter, on February 7, 2008, acknowledging that its statement pertaining to Sisto's land ownership was not "technically correct" because that land was actually owned in common by all 154 unit owners.  Ultimately, questioning Sisto's ownership of the land at issue, the CRMC refused to process Sisto's application.

---

[2] Pursuant to G.L. 1956 § 46-23-1(c), the Coastal Resources Management Council (CRMC) is "the principal mechanism for management of the state's coastal resources."

On March 4, 2008, Sisto filed a complaint (the America action) against America and the members of its executive board in the Newport County Superior Court. In that action he sought a declaratory judgment that he had "sufficient right, title and interest in the [l]and and airspace [surrounding his unit] * * * to confer standing to file the [a]pplication [for the expansion of his unit] with the CRMC" (count 1). He also sought relief for slander of title, alleging that America's correspondence with the CRMC, in which it stated that Sisto "does not own the land on which he wants to expand," was "maliciously published with the intent to deceive the CRMC" (count 2). Lastly, Sisto claimed that America "breached its contractual duties" to Sisto under the master declaration by virtue of that correspondence with the CRMC (count 3).

America answered the complaint on April 17, 2008, denying all three counts and asserting myriad affirmative defenses.[3] Five days later, on April 22, 2008, America moved for partial summary judgment on counts 2 and 3, pursuant to Rule 56(b) of the Superior Court Rules of Civil Procedure. In an accompanying memorandum, America argued that its correspondence with the CRMC was protected speech under Rhode Island's Limits on Strategic Litigation Against Public Participation Act, G.L. 1956 chapter 33 of title 9 (the anti-SLAPP statute), because Sisto's purported ownership of the land at issue was a matter of "public concern" directed to a governmental body.[4] Accordingly, America averred that it was entitled to judgment as a matter of law on counts 2 and 3. Pursuant to § 9-33-2(b), America also moved to stay discovery on those counts, which motion was granted on June 3, 2008.

On May 22, 2008, Sisto moved for partial summary judgment on count 1, as well as for sanctions against America under Rule 11 of the Superior Court Rules of Civil Procedure. In

---

[3] We note that America did not file a counterclaim for a declaratory judgment, which is ultimately important to our final disposition. See Part V, infra.
[4] We discuss this statute in detail in Part IV-(B), infra.

- 4 -

support of that motion, Sisto maintained that both the Harbor Houses declaration and the master declaration permitted him to make improvements, alterations, and changes to his unit, and authorized him to expand his unit on adjoining land. As to sanctions, Sisto claimed that a host of the denials and affirmative defenses outlined in America's answer to Sisto's complaint were made in contravention of Rule 11. Both parties filed objections to the other's respective motion for summary judgment, and America also filed a cross-motion for Rule 11 sanctions against Sisto's counsel for, in its view, Sisto's above-referenced meritless motion for sanctions against it.

Approximately two months after moving for summary judgment, on June 23, 2008, America also moved to dismiss count 1 of Sisto's complaint based on his failure to join indispensible parties—the other 153 unit owners in the Goat Island South Condominium community—pursuant to Rule 12(b)(7) of the Superior Court Rules of Civil Procedure.

Subsequently, on July 23, 2008, Sisto brought an action in Superior Court (the GIS action) against GIS and the two other sub-condominium associations in the Goat Island South Condominium community, Capella and Harbor Houses. This complaint named those three defendants as "parties in interest vis-à-vis the assertions made and positions advanced in [the America action], including those asserted in the [m]otions." The complaint essentially parroted the allegations set forth in count 1 in the America action—that Sisto, as a Harbor Houses Condominium unit owner, was permitted and authorized to make improvements, alterations, and changes to his unit and that he had sufficient title and interest to file an application with the CRMC regarding the expansion of his unit onto adjoining land. That same day, Sisto also moved for summary judgment in that action.

In GIS's answer, it neither admitted nor denied the substantive allegations. Additionally, GIS brought a counterclaim for a declaratory judgment, asking the Superior Court to decide

- 5 -

whether (1) Sisto had standing to pursue his application with the CRMC on his own; or (2) approval of the other 153 unit owners would be necessary prior to the submission of such application; or (3) approval under § 2.3 of the master declaration was required; or (4) approval under both (2) and (3) above would be required; or (5) other statutes, rules, regulations, or documents would be applicable to the issues raised. On November 7, 2008, GIS filed a cross-motion for summary judgment. Capella answered Sisto's complaint, denying the allegations and asserting affirmative defenses. Harbor Houses also answered Sisto's complaint; unlike GIS, Capella, and America, it admitted all of the complaint's allegations and asked the Superior Court to enter judgment in Sisto's favor. Further, Harbor Houses requested the Superior Court to issue a declaration that "Harbor House[s] Condominium unit expansions are specifically authorized by the constituent documents of the Harbor House[s] Condominium and [§] 2.3 of the [master declaration] and do not require the approval of all 154 Goat Island [South] Condominium unit owners [or] the approval of the executive boards of the other * * * sub[-]associations * * *."

After a hearing held on January 16, 2009, a justice of the Superior Court denied in part and granted in part Sisto's motion for partial summary judgment on count 1 in the America action. He found that, as a matter of law, Sisto had standing to file his application for the expansion of his unit with the CRMC; however, he issued a declaratory judgment stating that unanimous consent among the other 153 unit owners would be necessary before he could carry out that expansion.[5] The hearing justice also granted America's motion for partial summary

---

[5] Although no party has raised this issue, we note that, because America never filed a counterclaim for a declaratory judgment in the America action, the hearing justice did not have authority to issue the declaratory judgment in that action, in which he ruled that "consent of all 154 unit owners" would be required before Sisto could go forward with the expansion of his unit. See Nye v. Brousseau, 992 A.2d 1002, 1011 (R.I. 2010) ("[A] party should not be granted relief that it did not request." (quoting Providence Journal Co. v. Convention Center Authority, 824 A.2d 1246, 1248 (R.I. 2003)). However, a counterclaim for a declaratory judgment was filed in

- 6 -

judgment on counts 2 and 3, concluding that the anti-SLAPP statute barred those claims. With respect to the GIS action, the hearing justice similarly granted in part and denied in part Sisto's motion for partial summary judgment, as well as GIS's cross-motion for summary judgment with regard to whether unanimous consent of the unit owners was necessary before Sisto could go forward with his proposed expansion. On August 27, 2009, the hearing justice issued four separate written decisions, each addressing those respective motions. We summarize those decisions below.

In his decision denying in part and granting in part Sisto's motion for partial summary judgment in the America action, the hearing justice examined the master declaration, the Harbor Houses declaration and the Condominium Act. In so doing, he relied on § 2.8 of the Harbor Houses declaration (an amendment added in 1995) which expressly permitted a unit owner to "construct improvements to increase the size of the [o]wner's [u]nit and the [b]uilding containing the [u]nit subject to [certain limitations]." Next, in reviewing the master declaration, the hearing justice determined that it "require[d] a unit owner to receive approval from the Harbor Houses Executive Board before making any alterations or changes to the exterior of the building or increasing the building's size." However, the hearing justice reasoned, when any of the provisions of the Harbor Houses declaration or the master declaration conflict with the Condominium Act, the Condominium Act takes precedence. Further, relying on § 2.4(e) of the Harbor Houses declaration (mandating that "[a]ny changes, alterations or construction undertaken by any [u]nit [o]wner * * * shall be performed only in accordance with all applicable laws, ordinances and regulations * * *") and § 2.3(a)(i)(D) of the master declaration (stating that

the GIS action with respect to whether such unanimous consent would be required. Therefore, our ultimate decision reaches the merits of the trial justice's issuance of a declaratory judgment as to GIS's counterclaim.

improvements, alterations, or changes to a unit "shall be done in accordance with all applicable * * * [s]tate * * * laws"), he determined that it was incumbent upon Sisto to comply with the Condominium Act.

The hearing justice determined that, because the yard over which Sisto sought to expand was designated as a limited common element under both the Harbor Houses declaration and the Act, that expansion "would disturb the * * * allocation" of the limited common elements by transforming part of the yard surrounding his unit (a limited common element) into his actual unit, which "would ultimately decrease each unit owner's percentage interest in all [l]imited [c]ommon [e]lements." Under § 34-36.1-2.17(d), he continued, the Act required unanimous consent of the other 153 unit owners in that situation. Without such consent, he concluded, Sisto was not entitled to a declaratory judgment allowing him to expand his unit. Therefore, he denied in part Sisto's motion for partial summary judgment. With respect to Sisto's contention that he had standing to file an application for expansion with the CRMC, the hearing justice granted summary judgment in Sisto's favor. However, he stated that, because the CRMC had not been joined as a party, he could not mandate a corresponding obligation, on the CRMC's part, to further process that application.

Granting America's motion for summary judgment on counts 2 and 3 in that action, the hearing justice determined that America's correspondence with the CRMC was protected by the anti-SLAPP statute. In so deciding, he concluded that (1) America's letters to the CRMC constituted "a governmental procedure"; (2) the statements contained within those letters "constituted an issue of public concern"—meaning "public discourse regarding an issue of importance within the community"; and (3) the letters did not constitute a "sham" because they provided the CRMC with relevant information regarding the ownership of the land in question—

- 8 -

meaning that they were not "objectively baseless." Furthermore, in accordance with the anti-SLAPP statute, the hearing justice granted attorneys' fees to America, as the prevailing party.[6]

In the GIS action, the hearing justice ruled on Sisto's motion for summary judgment as he had in the America action, echoing the same rationale. Furthermore, in ruling on GIS's cross-motion for summary judgment on its claim for a declaratory judgment, the hearing justice concluded that: (1) under the terms of the Act, Sisto must obtain the unanimous consent of all unit owners before submitting to the CRMC his application for the proposed expansion of his unit; (2) approval pursuant to the master declaration and the Harbor Houses declaration was also required prior to that submission; and (3) other statutes, rules, regulations, and documents were applicable to and determinative of the issues raised in that action. Further, the hearing justice denied GIS's motion for summary judgment as to the declaration regarding Sisto's standing to pursue his application with the CRMC. Instead, the hearing justice determined that Sisto simply had standing to file that application.

Following those decisions, Sisto moved for reconsideration, which was denied. Final judgment entered with respect to both actions on December 3, 2010. Sisto then timely appealed both judgments to this Court. Harbor Houses also appealed the entry of judgment in the GIS action.

## II

### Issues on Appeal

Sisto contends that the hearing justice erred in concluding that his proposed expansion required the unanimous consent of the other unit owners. In support of this argument, he

---

[6] Pursuant to G.L. 1956 § 9-33-2(d), "[i]f the court grants the motion asserting the immunity established by this section, * * * the court shall award the prevailing party costs and reasonable attorney's fees, including those incurred for the motion and any related discovery matters."

maintains that the land surrounding his unit (over which the expansion would take place) is a limited common element—meaning that none of the other unit owners has any authority to use it. According to § 2.8 of the Harbor Houses declaration, he continues, improvements that increase the size of a unit are also identified as limited common elements. He therefore asserts that § 34-36.1-2.17(d)—mandating unanimous consent of all unit owners before unit boundaries may be altered—is not triggered because, under the terms of the Harbor Houses declaration, his proposed expansion would not alter his unit boundaries. Additionally, Sisto ascribes error to the hearing justice's conclusion that America's correspondence with the CRMC was protected speech under the anti-SLAPP statute.

Harbor Houses parrots the arguments made by Sisto in his brief to this Court. It maintains that § 2.3 of the master declaration and § 2.8 of the Harbor Houses declaration both provide that any improvements to a Harbor Houses Condominium unit are identified as limited common elements appurtenant to that unit. Thus, because the expansion would not change the unit boundaries, unanimous consent is not required under § 34-36.1-2.17(d). Further, Harbor Houses asserts, the contemplated expansion would not reallocate the limited common elements; likewise, unanimous consent is not required under § 34-36.1-2.17(d). In support of this last argument, Harbor Houses posits that Sisto's improvement over a limited common element would not alter the total square footage of land allocated to Harbor Houses Condominium under the master declaration. Additionally, it points out that ten other Harbor Houses unit owners have made improvements to their respective units and constructed these improvements over limited common elements without the unanimous consent of the 154 unit owners.

Countering Sisto's and Harbor Houses's contentions on appeal, America and Capella submitted a joint brief to this Court. They argue that the hearing justice correctly ruled that Sisto

- 10 -

must obtain the unanimous consent of the other 153 unit owners before expanding his unit. In support of this argument, they maintain that § 34-36.1-2.17(d) prohibits changing a condominium unit's boundaries without first obtaining such consent. Likening a limited common element to an easement, they posit that, although Sisto may have exclusive use of the yard appurtenant to his unit, the scope of this use does not give him unilateral authority to build on it.

In response to Sisto's criticism of the hearing justice's application of the anti-SLAPP statute, America maintains that its correspondence with the CRMC clearly satisfied the elements of that statute. Therefore, the hearing justice correctly determined that those letters were entitled to conditional immunity from Sisto's claims of breach of contract and slander of title. Lastly, GIS asserts that the hearing justice correctly concluded that Sisto's expansion required the unanimous consent of the other 153 unit owners, pursuant to § 34-36.1-2.17(d), and urges this Court to affirm the judgment with respect to the GIS action.

## III

### Standard of Review

We review a hearing justice's grant of summary judgment <u>de novo</u>. <u>In re Estate of Manchester</u>, No. 2012-85-A., slip op. at 5 (R.I., filed May 20, 2013) (citing <u>Swain v. Estate of Tyre</u>, 57 A.3d 283, 288 (R.I. 2012)). This Court "will affirm the granting of 'a party's motion for summary judgment if there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.'" <u>Zanni v. Voccola</u>, 13 A.3d 1068, 1070-71 (R.I. 2011) (quoting <u>Classic Entertainment & Sports, Inc. v. Pemberton</u>, 988 A.2d 847, 849 (R.I. 2010)).

Additionally, when reviewing the meaning and applicability of a statute, we engage in a <u>de novo</u> review. <u>Estate of Manchester</u>, slip op. at 5 (citing <u>Swain</u>, 57 A.3d at 288). "We have

consistently held that 'when the language of a statute is clear and unambiguous, [we] must interpret the statute literally and must give the words of the statute their plain and ordinary meanings.'" Id. (quoting Waterman v. Caprio, 983 A.2d 841, 844 (R.I. 2009)). Our "ultimate goal" is to "giv[e] effect to that purpose which our Legislature intended in crafting the statutory language." Zambarano v. Retirement Board of the Employees' Retirement System of Rhode Island, 61 A.3d 432, 436 (R.I. 2013) (quoting McCain v. Town of North Providence, 41 A.3d 239, 243 (R.I. 2012)). In this regard, "the plain statutory language" is "the best indicator" of the Legislature's intent. Id. (quoting McCain, 41 A.3d at 243). Furthermore, the Condominium Act contains official comments, which "are to be used as guidance concerning the legislative intent in adopting the chapter." America Condominium Association, Inc. v. IDC, Inc., 844 A.2d 117, 127 (R.I. 2004) (America I).[7]

Finally, "[i]n reviewing a [condominium] declaration, we find it appropriate to apply the laws of contract construction." Town Houses at Bonnet Shores Condominium Association v. Langlois, 45 A.3d 577, 583 (R.I. 2012). Thus, we review condominium declarations de novo. See Haffenreffer v. Haffenreffer, 994 A.2d 1226, 1231 (R.I. 2010).

---

[7] Public Laws 1982, ch. 329, § 3 states: "The secretary of state is hereby authorized and directed to print in the general laws following each section of [the Condominium Act], the corresponding official comments * * * which shall be used as guidance as to the intent of the legislature in adopting this chapter unless the statutory language shall clearly express otherwise in which case the statutory language shall prevail."

## IV

### Discussion

### A

### Unit Expansion

We cannot disagree with Sisto and Harbor Houses that the plain terms of § 2.3 of the master declaration and § 2.8 of the Harbor Houses declaration permit Sisto to expand his unit without obtaining the unanimous consent of the other 153 unit owners in the Goat Island South community. However, both of those declarations are subject to the Condominium Act, which, we conclude, requires Sisto to obtain such consent before expanding his unit. In arriving at this conclusion, we review the master declaration, the Harbor Houses declaration, and the Act.

Section 2.3(a)(i) of the master declaration states, in pertinent part:

> "Improvements, alterations or changes may be made to any building * * * of Harbor Houses Condominium to the extent permitted by its [d]eclaration as of June 30, 2007. No alteration, change in the exterior appearance or increase in the size of any building ('improvements') shall be made that is not first approved by the Harbor Houses Condominium executive board and that does not comply with [certain enumerated restrictions]."

Among those restrictions is a prohibition against an improvement encroaching (1) onto the yard designated as a limited common element of an adjoining residence unit; and (2) beyond the limited common elements of the residence unit that is being improved, altered, or changed. Additionally, § 2.3(a)(i)(M) of the master declaration states that

> "if any such improvements, alterations or increases in the size of any building would extend any portion of the building in which such unit is contained beyond the 'footprint,' so called, of the building * * * and change the exterior appearance of any building * * *, then the written final plans approved by the Harbor Houses Condominium executive board * * * shall be submitted to the [Goat Island South Condominium] Executive Board for review and a written advisory opinion * * *."

- 13 -

Thus, there is nothing in the master declaration that requires Sisto to obtain the unanimous consent of the other 153 unit owners before expanding his unit.

Likewise, the Harbor Houses declaration does not require such unanimous consent. Pursuant to § 2.4(g) of the Harbor Houses declaration, a unit owner must first obtain the written consent of the executive board before "mak[ing] or caus[ing] to be made any alterations or changes to any * * * [l]imited [c]ommon [e]lement (including, without limitation, the exterior of the [b]uilding in which such * * * [u]nit is located) * * *." Further, a 1995 amendment to the Harbor Houses declaration, entitled § 2.8, expressly allows a unit owner to

> "construct improvements to increase the size of the [o]wner's [u]nit and the [b]uilding containing the [u]nit subject to the following: (a) the improvements shall constitute a [l]imited [c]ommon [e]lement for the benefit of such [u]nit; [and] (b) the improvements shall not encroach on the yard designated as a [l]imited [c]ommon [e]lement for the adjoining [u]nit * * *."

Therefore, it appears that the Harbor Houses declaration permits a unit owner to expand the footprint of his or her unit onto his or her yard, so long as that expansion does not encroach onto the yard of the neighboring unit.

However, in addition to the declarations, the Act "applies to all condominiums created * * * after July 1, 1982 * * *." Section 34-36.1-1.02(a)(1). As stated above, the Goat Island South Condominium community was created in 1988—well after the Act took effect. Both of the above-referenced declarations are therefore subject to the Act. See America I, 844 A.2d at 127. Moreover, § 2.3(a)(i)(D) of the master declaration provides that "[improvements, alterations, or changes] * * * shall be done in accordance with all applicable * * * [s]tate * * * laws." Additionally, § 2.8(f) of the Harbor Houses declaration states that improvements to increase the

size of the unit and the building containing the unit "shall be done in accordance [with] all applicable * * * [s]tate * * * laws * * *."

Turning to the relevant portions of the Act, § 34-36.1-2.17(d) states that "no amendment may * * * change the boundaries of any unit, [or] the allocated interests of a unit, * * * in the absence of unanimous consent of the unit owners." (Emphasis added.). Under the Act, a unit is defined as "a physical portion of the condominium designated for separate ownership or occupancy, the boundaries of which are described pursuant to [the declaration]." Section 34-36.1-1.03(28). After carefully reviewing the master declaration, we find that it does not appear to include a specific definition of a unit, although § 1.18 provides that a Goat Island South Condominium unit refers to each of the three sub-condominiums—the America, Capella, and Harbor Houses condominiums. However, § 1.27 of that declaration also states that a "unit owner" is the "owner of a [r]esidence [u]nit"—meaning the owner of a unit contained within one of the three sub-condominiums. According to § 1.31 of the Harbor Houses declaration, a unit is "a physical portion of the [c]ondominium designated for separate ownership * * *." Section 2.3 of that declaration further provides that "[t]he boundaries of each of the [u]nits * * * are the floors, ceilings, walls, doors and windows * * *."

In what appears to be a legal fiction, both § 2.3(a)(i)(P) of the master declaration and § 2.8(a) of the Harbor Houses declaration provide that improvements which increase the size of a unit are designated as limited common elements. Therefore, if a unit owner expands his or her unit onto the adjacent yard, that expanded portion becomes a limited common element. Clearly, the declarations ascribe a meaning to a limited common element contrary to that of the Act. Under the Act, a limited common element is "a portion of the common elements allocated by the declaration * * * for the exclusive use of one or more but fewer than all of the units." Section

- 15 -

34-36.1-1.03(19). "[C]ommon element[s]" are defined as "all portions of a condominium <u>other than the units</u>." Section 34-36.1-1.03(4) (emphasis added). By definition, then, a unit is not a limited common element. Thus, by labeling such expansion as a limited common element, both declarations attempt to avoid the Act's requirement of unanimous consent before expanding a unit beyond its original boundaries.

We readily acknowledge that, where expressly provided for in the Act, condominium declarations may vary from the Act's provisions. <u>See</u> Section 34-36.1-1.04. In that regard, some of the defined terms used in the Act may be defined differently in a declaration. Section 34-36.1-1.03. However, we emphasize that, "[r]egardless of how terms are used in [the] [declarations], * * * terms have an unvarying meaning in the Act, and any restricted practice which depends on the definition of a term is not affected by a changed term in the [declarations]." Commissioners' Comment 1 to § 34-36.1-1.03. Thus, while the terms of a declaration may differ from the Act in certain situations, as we explain below, we deem this not to be one of them.

As noted above, the declarations give a meaning to a limited common element that directly contravenes a restricted practice in the Act, to which they are subject. Accordingly, § 34-36.1-2.17(d)—declaring that a unit owner must obtain unanimous consent of all other unit owners before changing the boundaries of his or her unit—cannot be undercut by the declarations' attempt to differentiate any expansion to a unit from the unit itself by characterizing the expanded portion of a unit as a limited common element, rather than as a new part of the unit. The Act explicitly states that a unit is distinct from a limited common element. Thus, we hold that, because Sisto's proposed expansion would "change the boundaries of [his] unit," he must obtain the unanimous consent of all other unit owners before going forward with that expansion.

See § 34-36.1-2.17(d).[8]  Since the Act defines a unit owner as a "person who owns a unit,"

which includes an owner of a sub-condominium unit, the unanimous consent must be from the

other 153 unit owners.[9]  See § 34-36.1-1.03(29) and America I, 844 A.2d at 130.

**B**

**The Anti-SLAPP Issue**

"The anti-SLAPP statute was enacted to prevent vexatious lawsuits against citizens who

exercise their First Amendment rights of free speech and legitimate petitioning by granting those

activities conditional immunity from punitive civil claims."  Alves v. Hometown Newspapers,

Inc., 857 A.2d 743, 752 (R.I. 2004).  To that effect, § 9-33-1 states, in pertinent part:

> "The legislature finds and declares that full participation by
> persons and organizations and robust discussion of issues of public
> concern before * * * administrative bodies * * * are essential to the
> democratic process, that there has been a disturbing increase in
> lawsuits brought primarily to chill the valid exercise of the
> constitutional rights of freedom of speech and petition for the
> redress of grievances; that such litigation is disfavored and should

---

[8] Although the hearing justice did not explicitly rely on § 34-36.1-2.17(d)'s requirement that a unit owner obtain unanimous consent prior to changing the unit's boundaries, it is well settled that we may affirm his decision on these alternate grounds.  See Berman v. Sitrin, 991 A.2d 1038, 1043 (R.I. 2010) (citing State v. Lynch, 770 A.2d 840, 847 (R.I. 2001)).

Because we hold that Sisto must obtain unanimous consent before changing his unit's boundaries, we do not address whether this change affects the allocated interests of any of the units under § 34-36.1-2.17(d).

[9] This mandate may seem draconian; however, when "[a] statute is within the power of the [L]egislature to enact, it is the duty of the court to sustain it, irrespective of its own opinion of the wisdom, reasonableness, or necessity for the statute."  In re Rule Amendments to Rules 5.4(a) & 7.2(c) of the Rules of Professional Conduct, 815 A.2d 47, 49 (R.I. 2002) (quoting Creditors' Service Corp. v. Cummings, 57 R.I. 291, 299, 190 A. 2, 8 (1937)).  Moreover, as we have often noted, the Act is a consumer-protection statute.  America Condominium Association, Inc. v. IDC, Inc., 870 A.2d 434, 437 (R.I. 2005) ("'[A]s a whole[, the Act] contains a strong consumer protection flavor,' because of 'a perceived need for additional consumer protection.'" (quoting America I, 844 A.2d at 128)).  Ownership of the common elements (which, by definition, includes all of the limited common elements) is held in common by the 154 unit owners.  As such, we do not deem it unreasonable that the 154 unit owners must consent to unit boundary changes over land which they own in common—namely, limited common elements.

- 17 -

be resolved quickly with minimum cost to citizens who have participated in matters of public concern."

However, this Court is mindful that there is a balance that must take place with respect to the applicability of the anti-SLAPP statute. As we previously recognized in Palazzo v. Alves, 944 A.2d 144 (R.I. 2008), the anti-SLAPP statute

> "pit[s] two sets of fundamental constitutional rights against each other: (1) defendants' rights of free speech and petition and (2) plaintiffs' rights of access to the judicial system and rights to non-falsely maligned reputations. Solutions to [this] problem must not compromise any of these rights. Plaintiffs must be able to bring suits with reasonable merit and defendants must be protected from entirely frivolous intimidation * * * in public affairs." Id. at 150 n. 11 (quoting John C. Barker, Common-Law and Statutory Solutions to the Problem of SLAPPs, 26 Loy. L.A. L. Rev. 395, 397-98 (1993)).

Thus, the anti-SLAPP statute should "be limited in scope," and "[g]reat caution should be the watchword in this area." Id. at 150, 150 n.10. With that in mind, we turn to the merits of America's anti-SLAPP affirmative defense.

According to § 9-33-2(a), "[a] party's exercise of his or her right of petition or of free speech [before or submitted to a legislative, executive, or judicial body, or any other governmental proceeding] * * * in connection with a matter of public concern shall be conditionally immune from civil claims, counterclaims, or cross-claims." However, that speech will not enjoy protection if it "constitutes a sham," meaning that it is "not genuinely aimed at procuring favorable government action, result, or outcome, regardless of ultimate motive or purpose." Id.

The anti-SLAPP statute can therefore be broken down into three elements. We examine their application to these facts. First, America's correspondence with the CRMC constitutes an "exercise of [its] right * * * of free speech" because it was in the form of a "written * * *

- 18 -

statement * * * made in connection with an issue under consideration or review by a legislative * * * body"—in this case, the CRMC. See § 9-33-2(e). Second, that correspondence dealt with a "matter of public concern" because Sisto's proposed unit expansion would impact the other unit owners in the Goat Island South community. Third, in order for the correspondence to fall within the embrace of the protections afforded by the anti-SLAPP statute, the correspondence must not have constituted a sham.

In determining this last element, we examine whether the statements made to the CRMC were "genuinely aimed at procuring favorable government action, result, or outcome, regardless of ultimate motive or purpose." Section 9-33-2(a). Further, we must examine whether the statements were "(1) [o]bjectively baseless in the sense that no reasonable person exercising the right of speech * * * could realistically expect success in procuring the government action, result, or outcome, and (2) [s]ubjectively baseless in the sense that it is actually an attempt to use the governmental process itself for its own direct effects." Section 9-33-2(a). With respect to whether the statements are subjectively baseless, we consider "whether the litigants 'utilized the process itself rather than the intended outcome in order to hinder and delay [a] plaintiff.'" Karousos v. Pardee, 992 A.2d 263, 271 (R.I. 2010) (quoting Pound Hill Corp. v. Perl, 668 A.2d 1260, 1264 (R.I. 1996)).

We cannot disagree with the hearing justice's conclusion that America's correspondence with the CRMC was aimed at procuring a favorable government outcome—that is, an outcome that aligned with the rights of the unit owners in the Goat Island South community. Sisto asserts that, "[h]ad [America] accurately advised [the] CRMC that [he] [did] not exclusively own the land" over which he sought to expand, he would not have brought a slander of title claim against America, thereby avoiding any anti-SLAPP issue. We agree that the language of the letter could

have been more forthright; however, we cannot say that America's failure to accurately state that Sisto did not "exclusively" own the land rendered the statement objectively baseless. That statement was a reasonable attempt on the part of America to alert the CRMC that Sisto did not have sufficient ownership of the land over which he sought to expand his unit. We cannot say that America's correspondence was an unreasonable attempt to achieve favorable government action.

Lastly, we conclude that America's correspondence with the CRMC was not subjectively baseless. There is no suggestion that America sent the letter to simply hinder or delay Sisto's expansion, without the ultimate intended outcome of achieving favorable government action— that is, preventing him from actually expanding his unit. See Karousos, 992 A.2d at 271. In sum, we hold that America's correspondence with the CRMC enjoys the protections afforded by the anti-SLAPP statute.

In disagreeing with our application of the anti-SLAPP statute, the dissent posits that "the [anti-SLAPP] statute may suffer from constitutional infirmities because the definition of petitioning activity * * * is overly broad and not confined to issues of public concern." Although the dissent raises an interesting issue for discussion, neither party has challenged the constitutionality of the anti-SLAPP statute. In light of our well-settled precedent cautioning against our sua sponte review of a statute's constitutionality, we deem it imprudent to engage in such a review in this case. See State v. DeRobbio, 62 A.3d 1113, 1119 (R.I. 2013) ("[A] trial justice does not have the authority to sua sponte attack the constitutionality of a statute; it must be raised by a party entitled to make such challenge." (quoting Devane v. Devane, 581 A.2d 264, 265 (R.I. 1990)). Moreover, this Court has previously declared that the anti-SLAPP statute is constitutional. See Hometown Properties, Inc. v. Fleming, 680 A.2d 56, 60 (R.I. 1996)

(resolving that the anti-SLAPP statute passed constitutional muster with respect to challenges asserting equal protection, the right to a trial by jury, due process, and denial of access to state courts, among other things).

Additionally, in citing to our "learned colleagues in Massachusetts" for their decision in Duracraft Corp. v. Holmes Products Corp., 691 N.E.2d 935 (Mass. 1998), the dissent seemingly overlooks the fact that, in that case the court was explicitly called upon to answer whether Massachusetts's anti-SLAPP statute was constitutional. Id. at 937, 939. As stated above, this Court has been asked no such question in this case.

V

**Conclusion**

For the reasons set forth in this opinion, we vacate in part and affirm in part the judgments of the Superior Court. Because America did not file a counterclaim for a declaratory judgment, we vacate the declaratory judgment issued in the America action with respect to whether unanimous consent is required before Sisto may go forward with the expansion of his unit. See note 5, supra. However, we affirm the judgment of the Superior Court in that action with respect to Sisto's standing to file the application for expansion with the CRMC, as well as with respect to the anti-SLAPP issue. Additionally, we affirm the judgment of the Superior Court in the GIS action declaring that the unanimous consent of the 154 unit owners must be obtained before Sisto may carry out his unit expansion. The papers may be remanded to the Superior Court.

**Justice Goldberg, concurring in part and dissenting in part.** I concur in that portion of the majority decision that holds that the plaintiff is required to obtain the unanimous consent of all unit owners before he may expand his unit in the manner in which he proposed—that is, onto the limited common elements of the condominium. However, because we part company on the application of the anti-SLAPP statute to the facts in this case, I respectfully dissent. It is my opinion that the challenged communications in this case—one written by the president of America Condominium and the other by an attorney engaged on behalf of his clients—amounted to actionable slander of title such that there was a factual basis for the claim. Accordingly, the immunity provisions of the anti-SLAPP statute are not available, and the award of attorney's fees should be vacated.

The parties before the Court are three condominium associations and the various unit owners of condominiums that make up the Goat Island South (GIS) condominium community. They are in privity. This is a dispute over a provision in the declaration for one of three sub-condominiums within the master GIS condominium. The majority opinion has acknowledged that, by its plain terms, § 2.3 of the Harbor Houses declarations permitted the expansion that Sisto proposed without the unanimous consent of the other unit owners. According to the record before us, other owners of Harbor Houses units already had expanded their townhouses in a like manner. Until today, the Harbor Houses declaration permitted a unit owner to expand his or her unit onto the limited common elements without first obtaining the consent of the unit owners. The parties in this case were engaged in a legitimate dispute concerning whether Sisto could expand onto the limited common elements of his unit. That dispute was resolved, as it should have been, by the courts, and not by the Coastal Resources Management Council (CRMC). The communications to the CRMC declaring that Sisto did not own the land on which he sought to

build flatly were untrue, and it was alleged that they were intended to stop the CRMC from reviewing Sisto's application. They apparently succeeded without disclosure of § 2.3 of the Harbor Houses declaration. Thus, there exists a factual basis for the claim of slander of title, and defendants should not be accorded immunity simply because the misrepresentations were made to a public agency in connection with its permitting responsibilities. Because I do not agree with the majority's conclusion that this was protected activity for which the declarants enjoy immunity, I would vacate the award of attorney's fees against plaintiff.

The provisions of the anti-SLAPP statute come into play only after a lawsuit has been filed in our courts. The act is designed to cut short "lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances[.]" G.L. 1956 § 9-33-1 (emphasis added). This salutary goal is accomplished by affording one party to that lawsuit conditional immunity from civil claims that are "directed at petition or free speech," unless the petition or free speech "constitutes a sham" as that term is defined in the statute. Section 9-33-2(a) (emphasis added). In my opinion, there must be a threshold determination that there is no factual basis for the claim and that the claim was "brought primarily to chill the valid exercise" of the right of free speech or petition. Section 9-33-1.

However laudable its goals, the anti-SLAPP statute also denies the adverse party his or her right of access to our courts and deprives that party of a judicial remedy that is guaranteed by our Constitution. It is this Court's duty to guard against the wrongful denial of access to our courts. Those who are injured turn to the courts for justice; they should not lightly be turned away. All doubts regarding the legitimacy of a claim in the anti-SLAPP context should be resolved in favor of allowing the case to proceed in the ordinary course. Where, as here, it is

undisputed that there is a factual basis for the lawsuit, dismissal and a mandatory award of attorney's fees is inappropriate. The anti-SLAPP statute includes a provision <u>mandating</u> the award of attorney's fees—granted in this case—and even provides for the more draconian specter of the mandatory award of compensatory damages, with the possibility of punitive damages, in certain cases. <u>See</u> § 9-33-2(d). (This, of course, would require a jury trial, with the prospect of further protracted litigation.) Thus, because the anti-SLAPP statute is strong medicine—but necessary at times—I am of the opinion that only claims with no substantial basis, which fairly can be classified as primarily relating to "petitioning activity," should be immune. Intentional torts, committed by persons with vested business interests in the outcome, particularly when they have standing to have the dispute adjudicated in an appropriate forum, should not qualify.

One of the letters that led to plaintiff's claim of slander of title was written by an <u>attorney</u>, on behalf of his <u>clients</u>, during the course of the attorney-client relationship. The other letter was signed by Natalie D. Volpe (Volpe), as president of the Executive Board of America Condominium. In her two-page letter, Volpe declares that "[t]he applicant does not own the land on which he wants to expand." By letter dated September 11, 2007, Volpe, on behalf of America Condominium, withdrew America's substantive objection to plaintiff's application. The letter said nothing about Sisto's title to his property.

The second communication, a letter authored by attorney R. Daniel Prentiss (Prentiss), on November 26, 2007, "on behalf of America Condominium Association and Capella Condominium Association[,]" included a substantive objection to the application, citing various

CRMC regulations—which clearly constitutes protected petitioning activity.[10] However, attorney Prentiss also wrote that, "[m]y clients further object to the application because the applicant is not the owner of the property on which the proposed activities will take place." This statement was incorrect. By letter dated February 7, 2008, Prentiss corrected the inaccuracies set forth in his earlier letter.

Thus, the statements contained in each letter were not accurate. At best, they were the result of sloppy draftsmanship; at worst, they amounted to slander of title designed to stop the CRMC. What is clear to me is that there was a good-faith basis for plaintiff's counsel to include a count for slander of title in the complaint in this case. This is what we expect of lawyers, who must comply with Rule 11 of the Superior Court Rules of Civil Procedure. Rule 11 provides in relevant part:

> "The signature of an attorney or party constitutes a certificate by the signer that the signer has read the pleading, motion, or other paper; that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law * * * and * * * is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation. * * * If a pleading, motion, or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, may impose upon the person who signed it, a represented party, or both, any appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's fee." (Emphasis added.)

Although plaintiff may not have prevailed on his claim for slander of title, that is not for the court to decide at summary judgment. It is my belief that, because there was a good-faith basis for the claim, no trial justice would impose Rule 11 sanctions in the context of this case, the

---

[10] Curiously, the Prentiss letter of November 26, 2007, appears to renew the substantive objection to plaintiff's application that had been withdrawn by America Condominium on September 11, 2007.

anti-SLAPP escape clause notwithstanding. These sound principles governing the practice of law in this honorable profession should not be sacrificed on the altar of "petitioning activity."

In his complaint, Sisto alleged that the statements were false—they were, as acknowledged by at least one author—and were "maliciously published with the intent to deceive the CRMC and to stop [Sisto's] [a]pplication from going forward." Sisto also alleged that the defendants "made those false statements[] with full knowledge that they were indeed inaccurate because [d]efendants were well aware that under the GIS Master Declaration and Condominium Act[, Sisto] has an undivided common ownership right and interest in the [l]and at the [s]ite." Finally, the complaint alleged that, "[a]s a result of [d]efendant[']s malicious conduct, the CRMC has halted the [a]pplication process causing [Sisto] to suffer damages, including without limitation legal fees and expenses." These allegations set forth a claim for slander of title. In conducting its de novo review in this case, the majority acknowledges that the communication was false—"the language of the letter could have been more forthright"—but the majority then resolves this issue by concluding that defendants merely failed to state "that Sisto did not 'exclusively' own the land" and, therefore, the statement was not objectively baseless. In my opinion, the majority inappropriately resolves an issue of fact at summary judgment. Because there is a factual basis for the claim, my de novo review leads to the conclusion that summary dismissal and the mandatory award of attorney's fees was wrong.

Not all speech and petitioning activity is protected by the Constitution. Just as one may not cry, "Fire!" in a crowded theater, a party who defames another or slanders his or her title to property may have to answer in our courts for his or her alleged tortious conduct. Intentional and allegedly malicious misstatements are not protected speech. Clearly, a complaint filed seeking recompense for the intentional tort of slander of title—where there is a factual basis for the

- 26 -

allegation—does not meet the legislative definition of a "lawsuit[] brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances * * *." Section 9-33-1 (emphasis added). It is my belief that whether a person has engaged in protected petitioning activity, such that the anti-SLAPP statute affords conditional immunity, should be the first order of business in these cases. This determination, in my opinion, requires more than a simple application of a statutory formula. The complaint should be examined in light of the intended purpose of the statute and the mischief to be remedied: to prevent the chill of one's First Amendment freedoms by the filing of a lawsuit "brought primarily to chill the valid exercise" of a person's constitutional rights. Section 9-33-1 (emphasis added). Furthermore, because the full application of the anti-SLAPP statute results in a final judgment, great care should be taken to guard against the denial of access to our courts.

Critically, § 9-33-2(a) provides immunity for any claim or counterclaim, "except if the petition or free speech constitutes a sham." "The petition or free speech constitutes a sham only if it is not genuinely aimed at procuring favorable government action, result, or outcome, regardless of ultimate motive or purpose." Id. (emphases added). In order to constitute a sham, the petition or free speech must be objectively baseless, such "that no reasonable person * * * could realistically expect success," and subjectively baseless, "in the sense that it is actually an attempt to use the governmental process itself for its own direct effects." Section 9-33-2(a)(1) and (2). This is an insurmountable burden with respect to the myriad cases that come before our public agencies. As we recognized in Karousos v. Pardee, 992 A.2d 263, 269 (R.I. 2010), this Court "never ha[s] held that a defendant's actions were objectively baseless." One can only wonder about a communication to a public agency that no reasonable person could expect to be successful.

- 27 -

Importantly, the sham exception, the only available defense under the statute, is silent on the issue that is of concern to me: What about those communications for which there is a factual basis to support a claim of tortious conduct? Petitioning activity that amounts to slander, defamation, or slander of title—or, in the case of judicial filings, misstatements or contumacious behavior by an attorney and officer of the Court—should not be immune. See Clarke v. Morsilli, 723 A.2d 785, 786 (R.I. 1998) (mem.) ("[C]ontemptuous tactics and arguments [of counsel] can be as easily made on paper as in open court."). Significantly, in Clarke, this Court, in the context of a petition to reargue a case alleging ethics violations against a public official, awarded attorney's fees to opposing counsel, based on remarks of counsel contained in the pleading that we deemed "contemptuous and demeaning to this Court." Id. at 785-86. Although the underlying petition to reargue was filed in a matter of great public interest and would otherwise constitute "petitioning activity," this Court nevertheless imposed sanctions, declaring, "[i]f ever there was a case in which a remedy should be fashioned, this is such a controversy." Id. (quoting Cheetham v. Cheetham, 121 R.I. 337, 342, 397 A.2d 1331, 1334 (1979)).

In my opinion, an initial determination that the challenged lawsuit is of the type that the anti-SLAPP statute is intended to prevent—one directed at petition or free speech and lacking a good-faith factual basis—is an important step in addressing a motion to dismiss based on the anti-SLAPP statute. This is so because of the broad sweep of the definition of "petitioning activity" as set forth in § 9-33-2(e), which provides:

> "As used in this section, 'a party's exercise of its right of petition or of free speech' shall mean any written or oral statement made before or submitted to a legislative, executive, or judicial body, or any other governmental proceeding; any written or oral statement made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other governmental proceeding; or any written or oral statement made in connection with an issue of public concern." (Emphases added.)

- 28 -

In the absence of a threshold determination that the challenged lawsuit was "directed at petition or free speech" and does not have a good-faith factual basis other than, or in addition to, the petitioning activity, the statute may suffer from constitutional infirmities because the definition of petitioning activity set forth in § 9-33-2(e) is overly broad and not confined to issues of public concern. By its terms, § 9-33-2(e) embraces any written or oral communication to virtually any public body, including filings in this Court.

In my opinion, the Legislature did not intend to immunize its citizens from otherwise wrongful comment. For example, suppose the defendant-declarant in a defamation suit had petitioned a state agency to discharge a public employee whose contract was up for renewal and falsely stated that the person had committed a criminal offense, suffered from a "loathsome disease," conducted himself or herself in a manner that was "incompatible with his [or her] business, trade, profession, or office," or was guilty of "serious sexual misconduct." Marcil v. Kells, 936 A.2d 208, 212 (R.I. 2007) (quoting Restatement (Second) Torts § 570 at 186 (1977)). These statements, of course, amount to slander per se and are actionable without the necessity of proving special harm. Id. However, under the broad language of § 9-33-2(e), the declarant is immune from liability if the statement was communicated to virtually any public agency, whether or not it was made in connection with a matter of public concern.

Certainly, members of the public should not be victimized by meritless, revengeful SLAPP suits brought in retaliation for, or designed to chill, valid petitioning activity. Nonetheless, because the anti-SLAPP statute has a countervailing chilling effect on one who may be the innocent victim of slander and professional harm, there must be a threshold showing that the challenged lawsuit primarily relates to petitioning activity and the claim has no basis in fact.

In Duracraft Corp. v. Holmes Products Corp., 691 N.E.2d 935, 943 (Mass. 1998), the Massachusetts Supreme Judicial Court first addressed the Commonwealth's anti-SLAPP statute and placed a limiting construction on the reach of the enactment. The underlying lawsuit in Duracraft alleged a breach of a nondisclosure and noncompete provision of an employment contract, except for the "lawful demand of any governmental agency." Id. at 937. When the employee testified at a deposition in favor of his current employer in a case alleging trademark infringement against his former employer, the former employer filed suit, alleging breach of the nondisclosure agreement. Id. at 938. The defendant moved to dismiss, alleging violations of the anti-SLAPP statute, id., which, in relevant part, is similar to this state's provision, including the definition of petitioning activity set forth in § 9-33-2(e). The Court held that the anti-SLAPP statute was not intended to authorize the dismissal of an otherwise valid claim. Id. at 943.

In construing the statute, our learned colleagues in Massachusetts observed that "[t]he typical mischief that the legislation intended to remedy was lawsuits directed at individual citizens of modest means for speaking publicly against development projects." Duracraft, 691 N.E.2d at 940. The Court declared that "SLAPP suits have been characterized as 'generally meritless suits brought by large private interests to deter common citizens from exercising their political or legal rights or to punish them for doing so.'" Id. (quoting Wilcox v. Superior Court, 33 Cal. Rptr. 2d 446, 450 (1994), overruled on other grounds by Equilon Enterprises v. Consumer Cause, Inc., 52 P.3d 685, 694 n.5 (2002)). The Court explained that "[t]he objective of SLAPP suits is not to win them, but to use litigation to intimidate opponents' exercise of rights of petitioning and speech." Id. Notably, the Court in Duracraft referred to an advisory opinion issued by the Supreme Court of New Hampshire, Opinion of the Justices, 641 A.2d 1012

(N.H. 1994), in which the New Hampshire Supreme Court acknowledged the difficulties in distinguishing SLAPP cases from ordinary lawsuits.[11] See Duracraft, 691 N.E.2d at 940.

The Court in Duracraft expressed its doubts "that the Legislature intended to create an absolute privilege" for a broad group of potential claims, or that the statute was intended to reach claims between business competitors or in cases where dismissal is sought "not to limit 'strategic litigation,' but as an additional litigation tactic." Duracraft, 691 N.E.2d at 940-41. Because the Legislature was silent with respect to the statute's "breadth and reach, and ignored its potential uses in litigation far different from the typical SLAPP suit[,]" the Court adopted a narrowing construction. Id. at 941. The Court noted that the focus of the existing statutory test was strictly focused on the complained-of speech without regard to the merits of the plaintiff's claim. Id. at 942. "The Massachusetts statute makes no provision for a plaintiff to show that its own claims are not frivolous." Id. Our statute suffers from the same malady. What about the plaintiff who truly has been injured during the course of a matter of public concern? Where does he or she go to obtain redress?

Because the statute in Massachusetts focused solely on the petitioning activity with no regard for the merits of the underlying claim, the Court declared that it potentially impinged on the other party's right of petition, thus altering the substantive law in a sweeping way. Duracraft, 691 N.E.2d at 942-43. The Court adopted a limiting construction that excludes motions to dismiss "brought against meritorious claims with a substantial basis other than or in addition to the petitioning activities * * *." Id. at 943 (emphasis added). The person seeking the protections of the anti-SLAPP statute must make "a threshold showing through the pleadings and affidavits

---

[11] In Opinion of the Justices, 641 A.2d 1012, 1015 (N.H. 1994), the New Hampshire high court advised the New Hampshire State Senate that legislation that would require a trial justice to adjudicate a factual dispute on the basis of the pleadings and affidavits of the parties would deprive a party of that state's constitutional guarantee of a jury trial.

that the claims against it are 'based on' the petitioning activities <u>alone</u> and have no substantial basis other than or in addition to the petitioning activities." <u>Id.</u> (emphasis added). Such a showing, the Court concluded, "should serve to distinguish meritless from meritorious claims, as was intended by the Legislature." <u>Id.</u>

In conclusion, it is my opinion that, before a party is declared immune from suit under the anti-SLAPP statute, a threshold showing must be made that the claim brought against the party is not meritorious and that the suit solely is based on the plaintiff's petitioning activities and not in addition to those activities. Because I am of the belief that the claim of slander of title was meritorious and was brought in good faith, based on misrepresentations by the parties or their counsel, separate and apart from the defendants' petitioning activity, I would vacate the award of attorney's fees. Consequently, I dissent.


**TITLE OF CASE:**    Bennie Sisto, as the Trustee of Goat Island Realty Trust v. America Condominium Association Inc., et al.

Bennie Sisto, as the Trustee of Goat Island Realty Trust v. Capella South Condominium Association, Inc., et al.

**CASE NO:**    No. 2011-30-Appeal.
(NC 08-119)

No. 2011-31-Appeal.
No. 2011-32-Appeal.
(NC 08-400)

**COURT:**    Supreme Court

**DATE OPINION FILED:**    June 26, 2013

**JUSTICES:**    Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**    Associate Justice Gilbert V. Indeglia

**SOURCE OF APPEAL:**    Newport County Superior Court

**JUDGE FROM LOWER COURT**:

Associate Justice Edward C. Clifton

**ATTORNEYS ON APPEAL:**

For Plaintiff:  Robert D. Wieck, Esq.

For Defendants:  Edmund A. Allcock, Esq.
                 Timothy J. Groves, Esq.
                 Justin T. Shay, Esq.