*Watson v. The Village at Northshore I Ass'n, Inc.*, No. 835-8-13 Cncv (Toor, J., Feb. 5, 2016).
[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

VERMONT SUPERIOR COURT
CHITTENDEN UNIT
CIVIL DIVISION

| | |
|---|---|
| ROY H.A. WATSON, III,<br> Plaintiff<br><br>v.<br><br>THE VILLAGE AT NORTHSHORE I<br>ASSOCIATION, INC.,<br> Defendant | Docket No. 835-8-13 Cncv |

RULING ON CROSS-MOTIONS FOR SUMMARY JUDGMENT, MOTION TO DISMISS,
AND MOTION FOR JOINDER

This is a remanded action for declaratory relief concerning various disputes between a unit owner and a condominium association. Plaintiff Roy H.A. Watson, III requests declaratory judgment on thirteen issues related to the governance of The Village at Northshore ("Northshore"), a condominium in Burlington. Brooks McArthur, Esq. and David J. Williams, Esq. represent Watson, and Carl H. Lisman, Esq. represents The Village at Northshore I Association ("the Association").

The Association moves to dismiss multiple issues for lack of subject matter jurisdiction and moves for summary judgment on all issues. Watson filed a notice of voluntarily withdrawn issues, which the court interprets as a motion to dismiss. Watson cross-moves for summary judgment. The Association also moves to join other unit owners under V.R.C.P. 19(a).

Facts

The following facts are undisputed unless otherwise noted. Watson has owned a unit at Northshore since 1987. Northshore was created in 1986 by the Declaration of Condominium of the Village at Northshore I ("Original Declaration"). Pl.'s Ex. 1. The Association amended the

Original Declaration multiple times between 1986 and 2012. When the Association adopted and recorded the Amended and Restated Declaration of Condominium ("Amended Declaration") in 2012, it replaced the Original Declaration and brought Northshore under the provisions of the Vermont Common Interest Ownership Act.[1] Id.

The dispute between the parties revolves around Northshore's division into units, common elements, and limited common elements, and the subsequent amendments that purport to alter the definition or boundaries of that division. "Common areas" or "common elements" include all parts of the property that are not units.[2] Orig. Decl., Art. I(A)(7). Each unit owner is permitted to use the common elements "in accordance with the purposes for which they were intended without hindering or encroaching" upon other unit owners' rights, subject to the Association's rules and regulations. Id. Art. III(B)(3). "Limited Common Elements" are the "portions of the Common Elements reserved for the exclusive use of one or more, but less than all, of the Units." Id. Art. I(A)(16).

A unit includes "the undivided interest in the Common Elements which pertain to that Unit, as defined in the [Condominium Ownership] Act." Id. Art. I(A)(10). The undivided interest "means the percentage interest of each Unit in the Common Elements." Id. Art. I(A)(27).

---

[1] Northshore was originally subject to Vermont's Condominium Ownership Act, 27 V.S.A. § 1301 et seq. Orig. Decl., preamble ("[T]he Declarant hereby submits the Property to the provisions of Chapter 15 Title 27 of the Vermont Statutes Annotated, known as the Vermont Condominium Ownership Act . . ."). Certain sections of Vermont's Common Interest Ownership Act, 27A V.S.A. § 1-101 et seq., apply to events and circumstances after December 31, 1998, while others apply to events and circumstances after December 31, 2011. The court will note this where it is relevant. *See* 27A V.S.A. § 1-204(a)(1)–(2). The remaining sections of the Common Interest Ownership Act apply to Northshore after the Association enacted its Amended Declaration in 2012. The Condominium Ownership Act provides that "[a]ll of the apartment or site owners may remove a property from the provisions of this chapter by an instrument to that effect, duly recorded, if the holders of all liens affecting any of the apartments or sites consent thereto or agree, in either case by instruments duly recorded, that their liens be transferred to the percentage of the undivided interest of the apartment or site owner in the property as herein provided." 27 V.S.A. § 1316(a). The parties have not submitted evidence that such an instrument was recorded or that the relevant lien holders consented to remove Northshore from the Condominium Ownership Act.

[2] The Original Declaration further defines common areas and common elements by reference to their definition in the Condominium Ownership Act, 27 V.S.A. § 1301 et seq.

Northshore consists of two- and three-bedroom units as well as single story "garden homes." Id. Art. II(C).

Each unit consists of space between defined boundaries. Id. Art. II(D). The upper boundary is "the horizontal plane of the bottom surface of the plasterboard of the ceilings of the second floor of the Two Bedroom Unit and the Three Bedroom Unit and of the first floor of the Garden Home." Id. Art. II(D)(1)(a). The lower boundary is "the horizontal plane of the top surface of the subflooring on the first floor." Id. Art. II(D)(1)(b). The vertical boundary is "the vertical plane which includes the innermost surface of the plasterboard of all walls bounding each Unit extending to intersections with each other and with the upper and lower boundaries." Id. Art. II(D)(2). According to the Association, each attic space is accessible only to the unit below it, and the attic spaces themselves are structurally separated by firewalls. Watson disputes this fact, arguing that the Board president, whose affidavit supports it, is not qualified to testify regarding the structure of the buildings.

Limited common elements include "[a]ny doorsteps, stoops, porches, decks, patios and all exterior doors and windows, equipment storage areas, closets or other fixtures or improvements designated to serve, attached to, or adjacent to a single Unit, but located outside the Unit's boundaries." Id. Art. III(A)(2). These limited common elements are "allocated exclusively" to a unit. Id. Additionally, "garage spaces" are "Limited Common Elements appurtenant to and for the exclusive use of the respective Units to which they are assigned." Id. Art. III(A)(3). The Original Declaration states that the garages are depicted in Exhibit B, which is an overhead drawing of Northshore. Id.

In October 2006 the Association recorded an amendment to the Original Declaration to allow garage spaces to be "reallocated by an amendment to [the Declaration] executed by the unit

3

owners between or among whose units the reallocation is made." Pl.'s Ex. 5. Unit owners executing the reallocation amendment must provide the recording fees and a copy of the amendment to the Association, which will record it. Id.

In January 2008 the Association recorded an amendment to the Original Declaration, adding "attic spaces and roof structures located immediately above a Unit" to the definition of limited common elements. Pl.'s Ex. 6. One purpose of this amendment is to "reclassify the attic spaces and roof system immediately above a Unit as a Limited Common Element in order to allow for extension of the livable area of a Unit." Id. The Association admits that the amendment purports to effect a reclassification, but argues that the attic spaces and roof structures located immediately above a unit have always already been limited common elements.

In November 2011 the Association recorded another amendment to the Original Declaration, this time replacing the phrase "attic spaces and roof structures located immediately above a Unit" with "attic spaces above a Unit and skylights above a Unit." Pl.'s Ex. 7. The Association does not dispute the language of the amendment but disputes that it changed the definition of limited common elements.

In September 1999 the Association's Board approved a plan for the owner of unit 136 to expand the unit into the attic space above it. The Board approved similar expansions of other units before and after the 2008 amendment. Watson asserts that each expansion into the attic space above a unit required the building structure to be altered and roof trusses removed. Pl.'s Ex. 4. The Association objects that no affidavit supports Watson's exhibit, a diagram of a unit expansion. The parties agree that some structural modification is necessary to expand a unit into the attic space above it.

4

Watson received permission to install a satellite dish on the chimney above his unit in 2008, and he installed the dish in 2009. In 2010 he relocated the dish to the roof above his unit. The parties dispute the reasons for and circumstances surrounding the relocation. Plaintiff petitioned the FCC in 2010 for a ruling on the Association's rules regarding satellite dishes. In 2013, the Association modified its satellite dish rule to conform with FCC rules.

In August 2011 Watson and the trustees of the Edmunds Living Trust executed an amendment that purported to reallocate a garage space from unit 127 to Watson's unit. Watson provided the amendment to the Association with the filing fee, but the Association has not recorded the amendment. The Association sent Watson a letter in which it indicated that it would file the amendment as soon as Watson corrected an error it contained. Pl.'s Ex. 11.

In June 2012 the Association recorded an Amended and Restated Declaration of Condominium (Amended Declaration). Pl.'s Ex. 12. The Amended Declaration provides that the Board or its representatives may enter any unit "after prior notice, to determine compliance with this Declaration and Rules, to enforce such compliance and for any other lawful purpose." Amended Decl., § 5.04(b).

The Amended Declaration also requires that unit owners maintain the temperature in their units "at all times at a level which will prevent the freezing of water pipes of both the plumbing and heating systems." Amended Decl., § 6.02(c)(ii). In 2005, the Association's insurance carrier advised its agent that as a result of a loss of $80,144 due to flooding from a burst pipe, it would not renew the Association's insurance coverage.[3] Pl.'s Ex. U. After the agent discussed with

_____

[3] Watson claims that this fact is disputed because "there is no evidence in the contemporaneous Board meeting minutes to substantiate this statement." The fact is, however, supported by an affidavit, and Watson does not claim that the evidence is inadmissible. Watson cites his own affidavit, claiming that "Defendant has acknowledged that it received no correspondence from the insurance carrier threatening to cancel coverage *over the temperature monitoring issue*" (emphasis added). Plaintiff's Response to Defendant's Statement of Undisputed Material Facts in Support of Motion for Summary Judgment. According to the exhibit Watson cites, the Association replied to Watson's request to produce correspondence in which the insurance carrier threatened to cancel coverage unless the Association mandated the use

various insurance companies how the Association could obtain coverage without prohibitive cost, the Association enacted the rule requiring temperature monitoring devices in each unit.[4]

The Association has required that unit owners maintain temperature monitoring devices since 2005. The current rules require unit owners to install and maintain temperature monitors that remotely alert the management company or other designee of the Board when the temperature of a unit falls below 45 degrees. Id. § 2.5.7. In a unit owner's absence, the Board or its agents "may take such reasonable action as is deemed appropriate including entry into the unit to verify the loss of heat and the actual temperature within the unit." Id.

The Board adopted rules on April 29, 2013, that state that "[n]o immoral, improper, offensive or unlawful use shall be made of any unit, and all valid laws and regulations of all governmental bodies having jurisdiction shall be observed." Pl.'s Ex. 13, § 2.3.1.

Plaintiff complained to the Board about the condition of the fence behind his unit in 2008. Plaintiff also requested that the Association relocate the fence. The parties dispute whether the fence has been repaired.

The Association Bylaws require that unit owners "desiring to address the Board of Directors shall give notice at least 48 hours prior to the Meeting; the President may waive this requirement for good cause shown." Ex. 15, § 6.06(f). The parties dispute the facts surrounding another unit owner's attempt to raise an issue with the Board.

---

of "temperature monitoring devices … in every unit." Pl.'s Ex. U. The Association stated that it had received no correspondence stating that the carrier would cancel coverage "unless the Association mandated *installation of temperature monitoring devices in all units*." Id. (emphasis added). That statement does not contradict the fact asserted by the Association: the carrier informed the Association's insurance agent that it would not renew coverage due to the $80,144 loss caused by a burst pipe. That fact is therefore not genuinely disputed.

[4] Watson attempts to dispute this fact by asserting that the rule was adopted "several months after the Board had chosen the exact model of temperature monitor that would be mandated." He also claims that the minutes do not mention "that an insurance crisis required the Board to adopt the temperature monitor rule." These assertions are not inconsistent with the fact asserted by the Association, which is therefore not genuinely disputed.

<u>Discussion</u>

I. <u>Motion to Dismiss under V.R.C.P. 41</u>

Watson filed a "Notice Re: Voluntarily Withdrawn Issues" on August 6, 2015. The Association filed its "Motion To Dismiss Or, In the Alternative, For Summary Judgment" on June 11, 2015, in which it argued that the court should dismiss three of the four issues that Watson now withdraws, or to grant summary judgment in favor of the Association on all four.

Voluntary dismissal by a plaintiff is permitted without order of the court or by stipulation only before the adverse party files an answer or a motion for summary judgment. V.R.C.P. 41(a)(1). The court therefore interprets Watson's "notice" as a motion for dismissal by order of the court. V.R.C.P. 41(a)(2). Under V.R.C.P. 41(a)(2), dismissal may be "upon such terms and conditions as the court deems proper."

Watson's amended complaint contained 13 issues for declaratory judgment. The Association investigated facts related to each issue and expended time and effort in addressing each of the issues in its motions to dismiss and for summary judgment. The Association requests that the court dismiss with prejudice the 4 issues that Watson now agrees to dismiss and that the court order Watson to reimburse the Association for fees and costs. The court agrees that given the timing of Watson's consent to dismissal it should be with prejudice. Thus, issues 8, 11, 12, and 13 of the amended complaint are dismissed with prejudice.[5] However, the request for attorney fees is denied. The fact that a party concedes that it cannot prove certain claims is not grounds for a fee award, absent further evidence regarding pursuit of, for example, obviously frivolous claims.

---

[5] The issue numbers refer to the numbers in Watson's amended complaint (Oct. 21, 2014).

7

The following issues remain:[6]

1. Whether the "access easement" included in the Amended Declaration, § 5.04 violated Watson's property rights under Vermont law (Issue 1).

2. Whether the Association can mandate the use of temperature monitors in units (Issue 2).

3. Whether the Association's bylaw that requires members who wish to address the board provide 48-hour notice violates Vermont law (Issue 3).

4. Whether the Association has an obligation to repair the fence located behind Watson's unit (Issue 4).

5. Whether Watson has the right to install an antenna on the "roof structure" immediately above his unit pursuant to Federal Communications Commission rules (Issue 5).

6. Whether unit expansion into either a common element or a limited common element to enlarge the living space of that unit violates Watson's property rights under Vermont law, and whether the removal of ceilings, joists, and roof trusses to enlarge the living space of that unit violates Watson's property rights under Vermont law (Issue 6).

7. Whether "roof structures" can be removed from the allocation of a limited common element without Watson's consent (Issue 7).

8. Whether the Association has an obligation to file the Amendment reallocating a garage space to Watson's unit (Issue 9).

9. Whether the Amended Declaration's redefinition of garages as limited common elements violates Watson's rights under Vermont law (Issue 10).

---

[6] Unless otherwise noted, the court refers below to the issues as they are numbered in Watson's Amended Complaint.

II. <u>Motion to Dismiss under V.R.C.P. 12(b)(1)</u>

The court first addresses the Association's motion to dismiss Issues 1, 3, 5–7, and 10 because it relates to subject matter jurisdiction.[7] The Association contends that these issues are not justiciable cases or controversies upon which the court may issue declaratory judgment. Additionally, with regard to Issue 5, the Association argues that the Federal Communications Commission (FCC) has sole authority to adjudicate the issue of satellite dish installation, and no private right of action exists under the FCC Rule at issue.

Watson requests only declaratory relief. 12 V.S.A. § 4711. The purpose of declaratory judgment is "to adjudicate and define specific rights and liabilities of parties." <u>Cupola Golf Course, Inc. v. Dooley</u>, 2006 VT 25, ¶ 10, 179 Vt. 427. A declaratory judgment should "serve some useful purpose to the parties" and "serve some practical end in quieting or stabilizing an uncertain or disputed jural relation either as to present or prospective obligations." <u>Walsh v. Andorn</u>, 311 N.E.2d 476, 478 (N.Y. 1974).

"The availability of declaratory relief turns on whether the plaintiff is suffering the threat of actual injury to a protected legal interest." <u>Dernier v. Mortgage Network, Inc.</u>, 2013 VT 96, ¶ 38, 195 Vt. 113 (quoting <u>Town of Cavendish v. Vt. Pub. Power Supply Auth.</u>, 141 Vt. 144, 147 (1982)). "[A]n action for declaratory relief must be based on an actual controversy; the claimed result or consequences must be so set forth that the court can see that they are not based upon fear or anticipation but are reasonably to be expected." <u>Dernier</u>, 2013 VT 96, ¶ 38 (quoting <u>Robtoy v. City of St. Albans</u>, 132 Vt. 503, 504 (1974)). The court lacks jurisdiction if the plaintiff "is merely speculating about the impact of some generalized grievance." <u>Town of Cavendish v. Vermont Pub.</u>

---

[7] Although the Association frames its motion to dismiss under V.R.C.P. 12(h)(3), the court will treat it as a motion to dismiss under V.R.C.P. 12(b)(1). Rule 12(h)(3) provides that a motion under 12(b)(1) may be filed at any time. *See* <u>Poston v. Poston</u>, 161 Vt. 591, 592 (1993) (mem.).

Power Supply Auth., 141 Vt. 144, 147 (1982). Whether the "facts are sufficiently immediate and real to make an actual controversy is something that must be worked out on a case-by-case basis." Wright, Miller & Kane, 10B Fed. Prac. & Proc. Civ. 3d § 2757. There is no precise test to determine whether there is a controversy, but "the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." Golden v. Zwickler, 394 U.S. 103, 108 (1969) (quotation omitted).

The Association argues that Watson's issues are general grievances, rather than justiciable controversies. It cites a previous decision in which this court ruled that it lacked subject matter jurisdiction when a plaintiff challenged the legality of condominium declaration provisions, rather than asserting an injury. Pinnacle at Spear Homeowners Ass'n v. Larkin Milot Partnership, No. S0700-08 Cnc, slip. op. at 5 (Vt. Super. Ct. Mar. 17, 2010) (Toor, J.). Pinnacle revolved around a declarant's retained but unexercised veto power over future amendments to the condominium's declaration. In this case, Watson asserts that he had acquired property rights that required his consent to alter, and that the Association subsequently altered its governing documents, affecting those rights without his consent. Whereas the plaintiff in Pinnacle speculated about a future, hypothetical injury, if Watson is correct, his injury has already occurred. Viewed together, the issues in this case reveal years of unsettled controversy between the parties.

In Issue 1, Watson seeks declaratory relief invalidating the provisions granting Board members access easements to enter units (§§ 5.04 and 6.02 of the Amended Declaration). The Association argues that Watson's complaint is a "generalized grievance" rather than a justiciable controversy because Watson has not suffered any injury. According to the Association, it has never exercised its right to enter Watson's unit or threatened to do so. It is not necessary, however, for

10

the Association to enter or to expressly threaten to enter Watson's unit for controversy to arise over whether an amendment to the declaration impermissibly abridges a protected legal interest.

Watson's ownership of unit 132 includes a right to exclude.[8] *See* Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 435 (1982) ("The power to exclude has traditionally been considered one of the most treasured strands in an owner's bundle of property rights."); Chioffi v. City of Winooski, 165 Vt. 37, 43 (1996) (quoting Esposito v. South Carolina Coastal Council, 939 F.2d 165, 170 (4th Cir. 1991) (stating that "the fundamental incidents of ownership, include[e] the right to […] exclude others from it")); 27 V.S.A. § 1305 ("Each apartment or site owner shall be entitled to the exclusive ownership and possession of his or her apartment or site.").

By accepting the deed to unit 132, Watson agreed to be bound by the terms of the Original Declaration, which included easements that limit his right to exclude. *See* Pl.'s Ex. 2; Orig. Decl. Art. V(E) (providing that unit owners must allow the Association and its agents access across their units for maintenance, repair, and replacement of the common elements and the units). The Amended Declaration arguably broadens the easement, or creates a new easement, to allow the Board and its representatives to enter a unit to determine compliance with the declaration and rules. § 5.04 ("Easement for Entry"). Thus, the actual controversy is whether the new or broadened easement, to which Watson allegedly did not consent, impermissibly encroaches on Watson's right to exclude. Since the Association has already recorded the Amended Declaration, this is a justiciable controversy that is ripe for declaratory judgment.

The Association similarly contends that Watson fails to allege injury by the rule that requires Association members to give 48-hour notice before addressing issues at Board meetings.

---

[8] Watson cites Barrett v. Kunz, 158 Vt. 15 (1992) for the proposition that because an easement is a right of use over the property of another, the creation of an easement directly implicates and abridges the right of a property owner to exercise his or her right to exclude others from entering. Barrett, however, deals with appurtenant easements and does not actually provide authority that Watson, as the owner of a condominium unit, has the right to exclude.

11

"Unit owners must be given a reasonable opportunity at any meeting to comment regarding any matter affecting the common interest community or the association." 27A V.S.A. § 3-108(a)(5). The parties do not dispute that Board meetings include an "Open Forum" time when unit owners can bring up questions or concerns. Watson does not assert that the Board ever denied him the right to address the Board, only that another unit owner attempted to bring up the issue of unit expansions, and the Board tabled the discussion. The statute requires that unit owners must have "a reasonable opportunity" to comment at meetings, but Watson fails to show that the 48-hour notice rule unreasonably limits the opportunity to speak. There is no justiciable controversy with regard to the 48-hour notice rule.

Next, the Association argues that Watson alleges no injury from the unit expansions into attic spaces and the redefinition of limited common elements (specifically "roof structures"). The Association claims that the theoretical impact that Watson alleges "cannot exist as a practical matter." According to the Association, the costs of repair and maintenance are borne by the owner of an expanded unit, not by the Association. The controversy, however, is whether the Board violated Watson's *interest* in the common elements, first when it allowed units to expand into the common elements, and next when it amended the Original Declaration's definition of limited common elements, including—and later excluding—"roof structures." There is no dispute that Watson, as a unit owner, has an interest in the common elements. The question of whether the Association violated Watson's property rights with regard to those attic spaces is a justiciable controversy because the Association's approval of unit expansions arguably affects Watson's interest in the attic spaces. This issue is closely connected with the questions of whether an amendment allocated the roof structure above Watson's unit to Watson, and whether a further amendment impermissibly altered that allocation without his consent. The resolution of this

12

controversy will quiet the parties' longstanding disagreement about the status of the attic expansions and the allocation of roof structures.[9]

The Association next argues that Watson's claim regarding his garage fails because "[i]t is not at all clear that the Amended Declaration alters the allocation of garage space, as Limited Common Elements, to any Unit," and "[w]hat is clear is the absence of any allegation of harm flowing from any such alteration, and the corresponding absence of justiciable controversy in [this Issue]." Watson's claim is that the Original Declaration allocated the attic space and roof above each garage to the unit owners as limited common elements, whereas the Amended Declaration limits garage space to "the area within the walls, ceilings and floors of the garages." Thus, the question is whether the Amended Declaration reallocated the attic and roof of Watson's garage, reducing his allotted exclusive use in violation of his rights. Watson's concern appears to be his ability to place satellite dishes on the roof. Because Watson claims a loss of exclusive use of the garage roof—presumably for satellite dish placement—he states a justiciable claim.

Finally, the Association moves to dismiss the satellite dish issue. First, the Association essentially argues that the issue is moot because Watson's dish is permitted to remain on his roof under the revised rules. However, under the new rules, Watson will have to seek permission if he seeks to install an upgraded dish or move his dish to a different location to get better reception. Watson's claim is that by requiring such processes, the Association violates his rights to the use of the roof. The issue is therefore not moot.

However, the Association also argues that this court does not have jurisdiction to decide this issue because Watson already petitioned the FCC to decide the matter. The Court agrees. The

---

[9] Watson's filings with the FCC indicate his plans to install satellite dishes on the roof. Although this court will not render a decision with regard to the application of the OTARD rule, the court's declaratory judgment with regard to whether the roof structures are limited common elements allocated to Watson potentially affects the application of the OTARD rule.

FCC's Over the Air Reception Devices Rule, 47 C.F.R. § 1.4000 ("OTARD rule") does not create a private right of action between a condominium association and unit owner. Scott v. Lantern Park Condo. Ass'n, No. CIV. 3:05CV1265AVC, 2006 WL 618108, at *4 (D. Conn. Mar. 9, 2006) (quoting Opera Plaza Residential Parcel v. Hoang, 376 F.3d 831, 835 (9th Cir. 2004)). The satellite dish claim is therefore dismissed.

## III. Cross-Motions for Summary Judgment

### A. Statutes of Limitation

The Association argues that it is entitled to judgment as a matter of law on several of the remaining claims because they are time-barred. According to the Association, Watson's claims regarding the easements for entry (Amended Declaration §§ 5.04 and 6.02), the bylaw requiring 48-hour notice before bringing an issue to a Board meeting, the redefinition of garages as limited common elements, and the removal of roof structures from the definition of limited common elements are controlled by 27A V.S.A. § 2-117. That statute provides that "[n]o action to challenge the validity of an amendment adopted by the association *pursuant to* [section 2-117 of the Common Interest Ownership Act] may be brought more than one year after the amendment is recorded." 27A V.S.A. § 2-117(b) (emphasis added).

Section 2-117 has applied to Northshore only since the Amended Declaration was recorded on June 25, 2012, subjecting the Association to the Common Interest Ownership Act in its entirety.[10] Watson's claims regarding the easements for entry challenge the validity of certain sections of the Amended Declaration. Although Watson filed his claims after section 2-117 applied to Northshore, section 2-117(b)'s one-year limitations period only applies to amendments adopted

---

[10] Section 2-117 is not one of the enumerated sections that applied before the Amended Declaration was recorded. *See* 27A V.S.A. § 1-204(a)(1)–(2).

14

pursuant to section 2-117. The Amended Declaration, including sections 5.04 and 6.02 and the revised definition of garage space, could not have been adopted *pursuant to* section 2-117 because that section did not apply until after the Amended Declaration was recorded. Therefore section 2-117(b)'s one-year limitations period does not apply to the issues that challenge those provisions.

The redefinition of limited common elements in the 2011 amendment preceded the Association's 2012 adoption of the Common Interest Ownership Act, including section 2-117. The Association nevertheless contends that because the Amended Declaration restated the "covenants, conditions, [and] easements … applicable to the property," Watson's challenge to the 2011 amendment is also a challenge to the Amended Declaration. Even if that were the case, challenges to the Amended Declaration, as noted above, are not limited by section 2-117(b) because section 2-117 did not control the Association's enactment of the Amended Declaration itself.[11]

Finally, the Association argues that Watson's claim regarding the Association's obligation to repair the fence accrued "at the latest" in August 2008, when Watson first notified the Board that the fence was in disrepair. This claim, says the Association, is subject to a six-year limitations period. 12 V.S.A. § 511; *see* Fitzgerald v. Congleton, 155 Vt. 283, 287 (1990) (noting that section 511 "is a catchall statute that applies to civil actions generally"). Watson first raised the fence claim in his amended complaint in October 2014.

The Association does not explain its reasoning that the claim accrued "at the latest" when Watson first brought his concerns about the fence's condition to the Board in 2008. Certainly a unit owner cannot be said to be on notice that the Association has breached its obligation to repair or replace a common element the moment the unit owner reports a damaged common element.

---

[11] In other words, the Amended Declaration, by subjecting Northshore to the Common Interest Ownership Act, provides that the Association will enact future amendments pursuant to section 2-117. Those amendments will generally be subject to the one-year limitations period in section 2-117(b).

15

The alleged breach, if there was one, would likely have occurred at some later time, when the Association was already aware of the need to repair or replace the fence and neglected to perform its obligation. Equally puzzling is Watson's argument that "[s]ince this cause of action has not yet accrued, [the] claim is not time-barred." The claims would have accrued at least by October 2009, when Watson alleges that all action on the fence ceased. Am. Comp. ¶ 29. The court cannot ascertain a specific date when the claim accrued, based on the undisputed material facts.

B. Access Easements (Issue 1)

Watson requests declaratory judgment that the "access easement" included in the Amended Declaration violates his property rights under Vermont law. The Original Declaration required unit owners to allow the Association and other unit owners access across each unit for maintenance, repair, and replacement of the common elements and units. Orig. Decl. Art. V(E). Under the Amended Declaration, the Board and its representatives may enter any unit in an emergency or to "accomplish emergency repairs," and "after prior notice, to determine compliance with [the Amended Declaration and Rules], to enforce such compliance and for any other lawful purpose." § 5.04(a)–(b).

The Condominium Ownership Act provides that "[t]he association of owners shall have the irrevocable right, to be exercised by the manager or board of directors, to have access to each apartment or site from time to time during reasonable hours as may be necessary for the maintenance, repair or replacement of any of the common areas and facilities therein or accessible therefrom, or for making emergency repairs therein necessary to prevent damage to the common areas and facilities or to another apartment or apartments or sites." 27 V.S.A. § 1306. The Common Interest Ownership Act provides that the unit owners must provide access "reasonably necessary" for maintenance, repair, and replacement of common elements and units. 27A V.S.A. § 3-107(a).

16

Watson argues that the "easement for entry" in the Amended Declaration expands the purposes for which the Board and its representatives may enter a unit beyond what is specifically allowed under Vermont law by allowing access to check for compliance with the declaration and rules. § 5.04. Watson does not argue that the Amended Declaration was unduly adopted, only that the Amended Declaration's "easement for entry" exceeds the authority for such easements in Vermont's statutes.

While the statutes do not expressly allow easements for other purposes beyond maintenance, repair, and replacement, they also do not limit a declaration's easements to the purpose of maintenance and repair. Watson takes issue with the Amended Declaration's grant of access to ensure compliance with rules. He notes that the Board has adopted rules that prohibit "immoral, improper or offensive behavior." The Amended Declaration's easement for entry does grant the Board the right to enter Watson's unit in a broader range of circumstances than the easement in the Original Declaration, but Watson has not shown that this easement is unlawful, void, or otherwise unenforceable. By accepting the deed to his unit, Watson accepted the terms of the covenants, including the method for amending the declaration, which can occur even if Watson is opposed to it. The easement does not violate Watson's property rights under Vermont law.

C. <u>Temperature Monitoring Devices (Issue 2)</u>

Watson argues that the Board cannot promulgate a rule that requires unit owners to install and maintain temperature monitors and permits the Board or its agents to enter units to verify the loss of heat or actual temperature. Pl.'s Ex. 13, § 2.5.7.

The Amended Declaration requires that unit owners maintain their own units such that their failure to make repairs does not damage other units or the common elements. § 6.02(c). Specifically, unit owners must maintain the temperature in their units "at all times at a level which

17

will prevent the freezing of all water pipes." Id. Unit owners (and their tenants or lesees) are liable for damages resulting from their "acts, neglect, or carelessness." Amended Decl., § 10.02. The Amended Declaration also prohibits activities that "may result in an increase in insurance rates occasioned by use … of a Unit …" Id.

The Association may generally adopt and amend rules. 27A V.S.A. § 3-102(a). Rules that "affect the use of or behavior in units" must "(1) implement a provision of the declaration; (2) regulate any behavior in or occupancy of a unit which violates the declaration or adversely affects the use and enjoyment of other units or the common elements by other unit owners; or (3) restrict the leasing of residential units to the extent those rules are reasonably designed to meet underwriting requirements of institutional lenders that regularly make loans secured by first mortgages on units in common interest communities or regularly purchase those mortgages." 27A V.S.A. § 3-120(f).

Watson argues that because the statutes and Amended Declaration do not specifically authorize the Board to require temperature monitors, and because maintenance of unit temperature (and each unit's condition, generally) is the responsibility of the unit owner, the Association (acting through the Board) cannot require temperature monitors. According to Watson, the Association is responsible only for maintenance of common elements. Watson additionally contends that the temperature monitor rule does not meet the requirements of section 3-120(f), and that the rule is "not reasonable" as required by section 3-120(h). He claims that the Association and unit owners are protected by the liability provision in the Amended Declaration, combined with the provision that requires that unit owners maintain temperatures that prevent pipes from freezing.

18

Watson cites Weldy v. Northbrook Condominium Association for the proposition that the declaration is the Association's "constitution." 904 A.2d 188, 191 (Conn. 2006). In Weldy, however, the Connecticut Supreme Court also cited with approval a case noting that "an association's power should be interpreted broadly, [and] the association, through its appropriate governing body, is entitled to exercise all powers of the community except those reserved to the members." Id. (quoting Schaefer v. Eastman Cmty. Ass'n, 836 A.2d 752, 756 (N.H. 2003)(quotation omitted)). "[P]rovided that a [board's action] does not contravene either an express provision of the declaration or a right reasonably inferable therefrom, it will be found valid, within the scope of the board's authority." Id. (quoting Beachwood Villas Condo. V. Poor, 448 So.2d 1143, 1145 (Fla.Dist.Ct.App. 1984)).[12] The provisions of the declarations that render a unit owner responsible for maintenance within the unit, and the Association responsible for maintenance of common elements except those damaged by unit owners, create obligations, not rights that the temperature monitor rule contravenes.

The Association argues that the temperature monitor rule implements the provisions in the Amended Declaration that require that unit owners maintain temperatures to prevent pipes from freezing and forbid unit owners from activities that lead to increased insurance costs. In the alternative, the rule "regulate[s] any behavior in or occupancy of a unit which violates the

---

[12] At the time of Weldy, Connecticut, like Vermont, had adopted the Uniform Common Interest Ownership Act. The Connecticut legislature had not yet enacted the provision analogous to Vermont's 27A V.S.A. § 3-120. Conn. Gen. Stat. Ann. § 47-261b. The court includes the discussion of Connecticut case law because it was raised by the parties. Although Watson and the Association argue for and against the temperature monitoring law in terms of § 3-120, that section was added by the legislature in 2009 to take effect in 2012. See 2009, No. 155 (Adj. Sess.), § 38. The parties do not dispute that the temperature monitoring rule at Northshore has been in effect since 2005. The Association did not move for summary judgment on the issue of the temperature monitoring rule on the basis of the statute of limitation.

declaration or adversely affects the use and enjoyment of other units or the common elements by other unit owners." 27A V.S.A. § 3-120(f).

The temperature monitor rule is not the only rule that affects the use of or behavior in units. The Association requires the use of lint filters in clothes dryers. Pl.'s Ex. 13, § 2.5.3. Similarly, units must have stove hoods and grease screens. Id. Unit owners must also provide the Board with written evidence of biannual boiler inspections and professional cleaning of dryer vents, as well as annual professional cleaning and inspection of wood-burning fireplaces and flues if used during the preceding heating season. Id. § 2.5.6(1)–(3). Like the temperature monitor rule, these rules require unit owners to take measures, at the unit owners' expense, designed to reduce the chance of damage to other units or common elements, even though a unit owner would already be liable for damage resulting from his acts or omissions. All of these rules are consistent with the terms of the Amended Declaration and the Original Declaration. The temperature monitor rule is reasonable in light of these other rules.

The rule implements a provision of the declaration by requiring a device that sends an alert when a unit's temperature is too low, causing a risk of broken pipes and damage to the surrounding units and common elements. The undisputed facts indicate that the decision to implement the rule also related to the cost of obtaining insurance for the Association. Thus, the rule also aims to curtail behavior that would violate the terms of the declaration by causing increased insurance costs.[13]

The temperature monitor rule does not have to be the most efficient or effective means of achieving its purposes to satisfy the requirements of section 3-120(f). Watson's motion for summary judgment on the temperature monitoring rule is denied. Because the undisputed facts

---

[13] Watson argues in a footnote that the rule is also unreasonable. 27A V.S.A. § 3-120(h). However, no reasonable jury could find that the rule is unreasonable.

show that the rule meets the statutory requirement of implementing a provision of the declaration the Association is entitled to summary judgment in its favor.

## D. Fence Repair (Issue 4)

Watson requests a declaratory judgment stating that the Association has an obligation to repair the fence located behind his unit. The parties do not dispute that the fence located behind Watson's unit is a common element. The Association bears the cost of maintaining, repairing, or replacing common elements. 27 V.S.A. § 1302(7)(B); 27A V.S.A. § 3-107(a) (providing that the Association is generally "responsible for maintenance, repair and replacement of the common elements"). The Original Declaration and the Amended Declaration provide that "[a]ny portion of the Common Elements which is damaged or destroyed shall be promptly repaired or replaced by the Association." Orig. Decl., Art. VI(A); Amended Decl., § 6.03. The Amended Declaration also specifies that replacements must be substantially similar to the original construction. Amended Decl., § 6.03.

Watson requested that the Association replace and relocate the fence in 2008. The Board and Association Building Committee considered and discussed the request in 2008 and 2009 but did not grant it. The parties disagree about what happened later. Neither party's undisputed material facts indicate that the fence was "damaged or destroyed" such that the fence's condition triggered the Association's obligation to replace it. The actual condition of the fence is a question of fact that is not definitively set forth in either party's facts. The court cannot determine whether the Association did or did not have an obligation to repair or remove the fence, or whether the "business judgment rule" applies. The undisputed facts do not entitle either party to summary judgment on this issue.

## E. Unit Expansions (Issue 6)

21

<u>Use of Attic Spaces</u>

Watson requests declaratory judgment stating that unit expansion into either a common element or a limited common element to enlarge the living space of that unit violates his property rights. The 2008 amendment, which designated attic spaces as limited common elements, says Watson, violated his rights under Vermont law by altering his undivided interest in common areas and facilities without his consent. The Amended Declaration continued to define the expanded areas as limited common elements.

Watson's argument is that when a unit's living space expands into a limited common element, it diminishes his undivided interest in common elements (of which limited common elements are a part). He argues that the expansions violate two provisions of the Condominium Ownership Act. First, "[t]he percentage of the undivided interest of each apartment or site owner in the common areas and facilities as expressed in the declaration shall have a permanent character and shall not be altered without the consent of all of the apartment or site owners expressed in an amended declaration duly recorded." 27 V.S.A. § 1306(b). Second, "[c]ommon areas and facilities shall remain undivided" and "[n]o apartment or site owner or any other person may bring any action for partition or division of any part thereof, unless the property has been removed from the provisions of [the Condominium Ownership Act]." 27 V.S.A. § 1306(c). Watson argues that the units that have expanded in the attic spaces have increased in value, and "[t]he diminishment of [Watson's] undivided interest is, of course, inversely proportional to the increased value of the expanded units."

The plain language of the statute refers to "percentage of undivided interest," which is "computed by taking as a basis the value of the apartment or site in relation to the value of the property." 27 V.S.A. § 1306(a). Exhibit C to the Original Declaration presents a schedule of values

of the units, and the corresponding percentage of undivided interest in the common elements. The Original Declaration assigned a value of $90,000 to Watson's unit (132) and 0.6781% undivided interest in the common elements.

The Common Interest Ownership Act provides that "[t]he declaration shall state the formulas used to establish allocations of interests." 27A V.S.A. § 2-107(b). The Amended Declaration simply provides that the percentage of undivided interest in common elements is set out in "Exhibit C," which appears to be the same schedule that was attached to the Original Declaration.[14] §9.08. The facts do not include any indication that the assigned unit values or corresponding percentages of undivided interest in common elements have been altered.

The undisputed facts also do not include evidence that the expanded units have increased in value generally. And even if the expanded units have increased in value, the statute requires an amendment by unanimous consent to alter the corresponding *percentages* of interest. The facts do not indicate that such an amendment has occurred. Therefore it is immaterial that the expanded units, by virtue of increased living space, sell at higher prices: Watson's percentage of undivided interest remains the same. Additionally, since the expanded living spaces are considered limited common elements, they are still owned in common by the unit owners even though each space is allocated for the use of only one unit—like the garages and decks at Northshore. No unit owner's percentage of undivided interest is altered when a unit's deck is extended, or when a unit owner acquires the use of a second garage.

The Condominium Ownership Act's provision requiring that common areas remain "undivided" and prohibiting actions for partition or division does not apply to amendments that

---

[14] The court's copy of Watson's Exhibit 12 (the Amended Declaration) is missing the page of its schedule that includes his Unit's value and percentage of undivided interest in the common elements, but the other pages of the schedule of values are identical to the schedule that was recorded with the Original Declaration. The undisputed facts do not show that the Association has altered the schedule of assigned percentages of undivided interest.

23

allocate the use of limited common elements to specific units. 27 V.S.A. § 1306(c). Since the Condominium Ownership Act provides for limited common areas, the use of which is by definition restricted to fewer than all units, it would make no sense to interpret this statute to mean that common areas cannot be limited common areas, or that the designation of limited common areas is the sort of "division" that the statute purports to prohibit. Rather, this statute disallows unit owners from acting to legally divide or partition any part of the common areas. The unit expansions at issue in this action cannot be characterized as actions to claim ownership or to force partition of common elements.

Watson compares the expansion of units in Northshore to the improvements increasing the size of a unit in Sisto v. Am. Condo. Ass'n, Inc., 68 A.3d 603 (R.I. 2013). Sisto was an action for declaratory relief regarding unit expansion within a condominium that includes three "subcondominium residential areas," each of which is governed in accordance with a master declaration and its own declaration. Id. at 606. Sisto sought to expand his unit into the adjacent yard. Id. at 610. He argued that the yard was a limited common element and that unit expansions, according to his subcondominium's declaration, were also limited common elements. Id. Under Rhode Island's Condominium Act, amendments that change unit boundaries require unanimous approval of unit owners. R.I. Gen. Laws § 34-36.1-2.17. The Sisto Court held that a declaration could not circumvent the statute's requirement for unanimous consent by creating a "legal fiction" that an expansion merely occupies limited common elements rather than changing the unit's boundaries. Id. at 614.

Sisto is of little help in this case. First, a proposed expansion of a unit's footprint into a lawn area that could more likely be used by other unit owners differs from the Association's approval of expansions into attic space that is otherwise unusable to any unit other than the one

24

below each attic. Second, Vermont lacks an analogous statute that requires unanimous consent for unit expansions. As for expansion under the Amended Declaration, the Common Interest Ownership Act specifically allows amendments, by 67 percent vote, to relocate boundaries between common elements and units such that common elements are incorporated into units. 27A V.S.A. § 2-112(b). Vermont law does not require the unanimous consent that the declaration in Sisto sought to circumvent.

The Association's insistence that units expanded into attic spaces are using limited common elements draws on a similar legal fiction, but it does not circumvent a statute that clearly intends to require unanimous approval of unit expansions. Watson is not entitled to summary judgment on the unit expansion issue.

The Association argues that it had authority to permit unit expansions into the attic spaces. Before the 2008 amendment, attic spaces were either common elements (because they are outside of the unit boundaries) or already limited common elements as "portions of the Common Elements reserved for the exclusive use of one or more, but less than all, of the Units." Orig. Decl., Art. I(A)(16). The 2008 amendment expressly includes attic spaces as limited common elements.

The Association may "regulate the use, maintenance, repair, replacement, and modification of common elements," "make additional improvements to the common elements," and "grant easements, leases, licenses, and concessions through or over the common elements." 27A V.S.A. § 3-102(a)(6), (7) and (9). Limited common elements, as portions of the common interest community other than units, are a type of common element. 27A V.S.A. § 1-103(4).

Although most provisions of the Common Interest Ownership Act did not apply to Northshore until the Association recorded the Amended Declaration in 2012, sections 1-103 and 3-102(a)(6) applied to events and circumstances occurring after December 31, 1998. 27A V.S.A.

25

§ 1-204(a)(1). The provisions relating to "additional improvements" and easements did not govern Northshore until 2012. The Board approved some of the challenged expansions before 2012. The subsection that authorizes the Association to regulate the use and modification of the common elements empowered the Board to approve unit owners' expansions of their units into the attic spaces. *See* 27A V.S.A. § 3-102(a)(6). The original bylaws provided that "[n]othing shall be altered or constructed in or removed from the Common Elements except upon the prior written consent of the Board of Directors." Ex. A-1 at V(H)(1)(d). Watson does not dispute that the Board consented to the expansions.

The Association argues that prior to the 2008 amendment that expressly characterized the attic spaces as limited common elements, the attic spaces were either already limited common elements because access to them was only possible from the unit below, or they were common elements that could be used by the units below without interfering with other unit owners' use of them because other units had no way of accessing them. It is not necessary for the court to conclude that the spaces were already limited common elements prior to the 2008 amendment because the statutes authorize the Board's approval of construction and regulation of use of the attic spaces. The Association is entitled to summary judgment on the issue of unit expansions.

Removal of Ceilings, Joists, and Roof Trusses

Watson's Motion for Summary Judgment treats the actual removal of ceilings, joists, and roof trusses as a separate issue, although in the Amended Complaint, it appeared to be part of the issue of unit expansion into the attic spaces. The Association argues that Watson's evidence does not support his assertion that specific structural elements were removed for all the unit expansions in question, but the parties agree that the unit expansions required some alteration of the building's structure. Watson argues that these structures are common elements and that Vermont law requires

that they "shall have a permanent character and shall not be altered without the consent of all of the apartment or site owners expressed in an amended declaration duly recorded." 27 V.S.A. § 1306(b).

The statute does not mean that common elements as such cannot be physically altered without consent of all unit owners; it refers to the "permanent character" of "the *percentage of the undivided interest* of each apartment or site owner in the common areas and facilities." Id. (emphasis added). As noted above, the unit expansions do not alter the percentage of undivided interest in common areas—Watson's percentage of undivided interest remains as indicated in the schedule of unit values and corresponding percentages of undivided interest.

Vermont law does not support Watson's request for declaratory relief regarding the issue of removal of ceilings, joists, and roof trusses. The Association did not expressly move for summary judgment on this issue as a separate issue, but it substantively overlaps the unit expansion issue.[15] The court understands this issue to be included in the unit expansion issue, and grants summary judgment in favor of the Association for the same reasons.

## F. "Roof Structures" (Issue 7)

In 2008, the Association amended the Original Declaration to include "attic spaces and roof structures immediately above a Unit" in the definition of limited common elements. Watson argues that the subsequent amendment in 2011, which removed "roof structures" from the definition of limited common elements, violated Vermont law by altering the allocation of a limited common element without his consent. 27A V.S.A. § 2-108(a). In the alternative, Watson argues that the 2008 amendment created a covenant running with the land that would require his

---

[15] The Association based its motion for summary judgment on the issues as they are enumerated in Watson's amended complaint, in which the unit expansion issue encompassed structural modifications. In Watson's motion for summary judgment, he separated unit expansion and structural modification.

consent to extinguish. According to Watson, the 2011 amendment took away Watson's exclusive use and control of the roof structure without his consent.

The section of the Common Interest Ownership Act that requires an affected owner's consent to alter the allocation of a limited common element did not control Northshore until its members recorded the Amended Declaration in 2012. At the time of the challenged 2011 amendment, such alteration was authorized by the terms of the Condominium Ownership Act, which requires that a declaration include the method by which the declaration may be amended. The Original Declaration requires agreement of the owners of units to which 2/3 of the votes appertain. *See* 27 V.S.A. § 1311(11); Art. XI(B). The parties do not dispute that the Amended Declaration was executed by that method. The Original Declaration does not specify that a unanimous vote is required, nor does it require the consent of an affected unit owner to alter the allocation of a limited common element.

Watson relies on general principles of property law to argue that the 2008 amendment created a covenant running with the land that granted him exclusive use of the roof structures above his unit, which could only be extinguished by his consent as the benefitted party. *See* Chimney Hill Owners' Ass'n, Inc. v. Antignani, 136 Vt. 446, 454–55 (1978) ("For a covenant to be enforceable as running with the land, four requirements must be met: a writing, intent, touch and concern, and notice."); *see also* Albright v. Fish, 136 Vt. 387, 394 (1978) ("A release extinguishes only the estate of the releasor.").

The 2011 amendment cannot be viewed as a covenant in isolation of the Original Declaration in which it is embedded: the amendment is part of the declaration. Watson, in accepting the deed for his unit, acknowledged prior receipt of the Original Declaration and bound himself, his heirs, and assigns to its provisions, one of which allowed for amendments to the

28

Declaration by 2/3 vote. See Pl.'s Ex. 2. It cannot be the case that unit owners possess the power to veto any amendment that touches and concerns their property, regardless of a declaration's method for amendment. By accepting the deed to a unit in Northshore, Watson consented to be bound by future, duly enacted amendments, regardless of whether he agreed with them or voted against them. Watson's motion for summary judgment on the issue of roof structures is denied.[16]

## H. Obligation to Record Garage Reallocation (Issue 9)

Watson requests a declaratory judgment that the Association is obligated to file the Amendment reallocating garage space to his unit. Pursuant to a 2006 amendment to the Original Declaration, unit owners can reallocate a garage by executing an amendment. Pl.'s Ex. 5. The 2006 amendment requires the Association to record the amendment. Id. Watson and the other party executed the reallocation amendment, but the Association declined to record it. *See* Pl.'s Ex. 11. As Watson's own exhibit plainly indicates, the Association pointed out that the amendment inaccurately stated that the grantors had received their deed to the garage from Northshore, rather than David Keith Johnston. Id. The Association offered to record the amendment promptly as soon as it was corrected. Id.

Although Watson framed his complaint exclusively as a request for declaratory relief, his Motion for Summary Judgment requests specific performance: the court should "order the Association to record the amendment transferring interest in the garage space to him." However, "[e]very contract or duty governed by this title imposes an obligation of good faith on all parties in its performance or enforcement," and the facts do not indicate a breach of this obligation. 27A V.S.A. § 1-113. The Association's letter rejecting Watson's reallocation amendment clearly requests a simple correction to the amendment and states that the Association will file it when it is

---

[16] The Association did not submit a substantive argument for summary judgment on the issue of the roof structures.

corrected. The undisputed facts do not indicate whether the Association was correct regarding the language in the amendment. The facts also do not indicate that Watson executed the correction.

Watson's argues that the terms of the 2006 amendment require the Association to record the amendment regardless of its erroneous content. There is nothing in the undisputed facts that indicates a lack of good faith on the part of the Association in refusing to record an amendment when it knows that the contents are false. The court cannot grant Watson summary judgment on this issue in the form of declaratory relief or an order of specific performance.[17]

## H. Redefinition of Garages (Issue 10)

Watson contends that the Association's "redefinition of garages as Limited Common Elements" violates Vermont law. The Original Declaration states that the "garage spaces depicted on Exhibit B shall be Limited Common Elements appurtenant to … the respective Units to which they are assigned." Art. III.A.1. Exhibit B of the Original Declaration is an overhead drawing of Northshore, which depicts the footprints of the units and garages. Each garage is numbered to match the number of a corresponding unit. The Amended Declaration changed the description of limited common elements to "the garage stalls (that is, the area within the walls, ceilings and floors of the garages) referred to on Exhibit B." § 3.01(a). "Each garage stall designated on Exhibit B or thereafter re-assigned is appurtenant to … the respective Unit to which it is assigned. The garage stalls were originally numbered to correspond to the number of the Unit to which each was originally appurtenant." Id.

Watson argues that because Exhibit B of the Original Declaration was an overhead depiction, "the entire garage structure, including the roof, the attic, the interior walls and the floor" was a limited common element assigned to him for his exclusive use. He concludes that when the

---

[17] The Association did not move for summary judgment on this issue.

30

Association amended the definition of garages as limited common elements to restrict the corresponding unit owners' exclusive use to the interior of the garage, it altered the "allocation" of a limited common element. *See* 27A V.S.A. § 2-108(a) (generally requiring a unit owner's consent to alter the allocation from the unit to which a limited common element was allocated).

In order for Watson to succeed on this issue, the court would have to determine that the Original Declaration actually allocated "the entire garage structure, including the roof, the attic, the interior walls and the floor" to Watson. The Original Declaration simply states that the garage spaces "depicted on Exhibit B" are limited common elements appurtenant to the units to which they are assigned. The fact that the drawing depicts only an overhead view does not unequivocally lead to the conclusion that the declaration allocates the entire structure, "including the roof, the attic, the interior walls and the floor" to Watson. Notably, the drawing depicts units in the same two-dimensional manner. To the extent that the drawing relates to the garages as limited common elements, it only shows which "garage space" is allocated to each unit. The text of the Original Declaration describes the allocated area as "garage space," which also does not support the conclusion that the exterior structures are limited common elements as opposed to common elements.

The definition of limited common elements in the Amended Declaration includes the interior of garages and is consistent with the previous allocation and does not alter the allocation. Because the Amended Declaration does not alter the allocation—the garages remain appurtenant to each unit as indicated by the drawing or by a subsequent amendment—the consent requirement in section 2-108(a) does not apply.

Watson also argues that the definition of garages as limited common elements in the Original Declaration created a covenant running with the land, and the benefit from that covenant

31

cannot be extinguished without his consent. Watson urged the court to apply the same reasoning to the roof structure issue, and the court declines to do so for the same reasons it outlined above: the covenant regarding the use of the garages as limited common elements cannot be separated from the context of the entire declaration. The deed to Watson's unit binds him to all the terms of the Original Declaration, including a procedure for amendment that does not require his individual consent. And even if his consent was required, the Original Declaration did not expressly include a covenant to use "the entire garage structure, including the roof, the attic, the interior walls and the floor." His allocation, which allows him to use the interior of the garage, remains unchanged in the Amended Declaration. Watson is not entitled to summary judgment on this issue.[18]

IV. Motion for Joinder of Indispensable Parties

The Association moves to join the Association's members as indispensable parties. The court must order a person to be made a party if "the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the person's claimed interest." V.R.C.P. 19(a). In an action for declaratory relief, "all persons shall be made parties who have or claim any interest which would be affected by the declaration, and no declaration shall prejudice the rights of persons not parties to the proceeding." 12 V.S.A. § 4721. However, "[a]n action alleging a wrong done by the association, including an action arising out of the condition or use of the common elements, must be brought only against the association and not against any unit owner." 27A V.S.A. § 3-111(b)(1).

---

[18] The Association's motion for summary judgment with regard to this claim is limited to its argument that the claim is time-barred.

The Association argues that because Watson challenges provisions of the governing documents which every unit owner (member) at Northshore has the right to enforce, the court must order all of the Association's members to join the action as parties. Specifically, the Association argues that the court must order the members to join the action if the court denies the Association's motions with regard to issues 1–3, 5–7, and 10. Because the court has dismissed issues 3 and 5 and granted summary judgment on issues 1, 2, and 6, it will decide the Association's motion for joinder only with regard to issues 7 and 10. These issues deal with the definitions of "roof structures" and garages as limited common elements.

The Association's argument for mandatory joinder of its members primarily relates to the concern that Watson "desire[s] to use any judgment he obtains in this action as the basis for future lawsuits against other Unit Owners." While it is apparent that this concern for future lawsuits relates to issues 2 and 3 (unit expansion and removal of ceiling, joists, and roof trusses), the Association provides no further explanation of how the court's decisions regarding allocation of garages and "roof structures" affect individual member's interests in such a manner that joinder is mandatory. If the court ultimately decides those issues in Watson's favor, then at most, the declaratory judgments will be limited to the application of the amendments and rules to Watson.

The Association also argues generally that the court should order all members to join because Watson's challenges to provisions of the governing documents affect the interests of all unit owners equally. Although decisions related to the validity or enforceability of provisions in the governance documents affect all of the Association's members, the court cannot ignore section 3-111(b)(1), which seeks to prevent association members from being haled into court every time a disgruntled member challenges an amendment, bylaw, or rule.

The Association argues that courts in other jurisdictions have held that all members of a homeowners' association are necessary parties in an action to invalidate provisions of the governing documents. Only one case cited by the Association actually deals with the question of joinder of indispensable parties under Rule 19 while considering the provision in the Uniform Common Interest Act that requires actions to be filed against associations rather than unit owners.[19] *See* Clubhouse at Fairway Pines, L.L.C. v. Fairway Pines Estates Owners Ass'n, 214 P.3d 451, 456 (Colo. App. 2008); Colo. Rev. Stat. Ann. § 38-33.3-311.

In Clubhouse at Fairway Pines, L.L.C. the Colorado Court of Appeals held that the relevant section of the Common Interest Ownership Act was "intended to 'change the law in states where plaintiffs are forced to name individual unit owners as the real parties in interest to any action brought against the association.'" 214 P.3d at 456 (Colo. App. 2008) (quoting Uniform Common Interest Ownership Act § 3-111 cmt. 1). The court concluded that the statute did not establish that the association provided adequate representation of its members for purposes of determining indispensable parties. Id. The outcome of Clubhouse at Fairway Pines, L.L.C. determined whether members would avoid paying fees or continue to benefit from a temporary club facility. Id. at 457. Unlike Clubhouse at Fairway Pines, L.L.C., the outcome of the remaining issues in this case will not potentially subject Northshore's unit owners to additional fees or a loss of use of facilities.

Despite the interpretation of the equivalent statute in Clubhouse at Fairway Pines, L.L.C., section 3-111 does not merely permit plaintiffs to name associations as defendants rather than individual unit owners. The statute provides that "[a]n action alleging a wrong done by the association, including an action arising out of the condition or use of the common elements, *must* be brought *only* against the association and *not against* any unit owner." 27A V.S.A. § 3-111(b)(1)

---

[19] The other cases are from jurisdictions in which the legislature has not enacted a version of the Uniform Common Interest Ownership Act.

(emphasis added). Not only does the plain language of the statute require Watson to bring the action solely against the Association; it also restricts him from filing against other unit owners.

Section 3-111(b)(1) is clearly in tension with the Declaratory Judgment Act, which provides that "all persons shall be made parties who have or claim any interest which would be affected by the declaration, and no declaration shall prejudice the rights of persons not parties to the proceeding." 12 V.S.A. § 4721. It is a "long-standing rule of statutory construction that where two statutes deal with the same subject matter, and one is general and the other specific, the more specific statute controls." Town of Brattleboro v. Garfield, 2006 VT 56, ¶ 10, 180 Vt. 90 (citing Looker v. City of Rutland, 144 Vt. 344, 346 (1984)). Additionally, "newer statutes will be enforced over older statutes, if there is a conflict." Our Lady of Ephesus House of Prayer, Inc. v. Town of Jamaica, 2005 VT 16, ¶ 16, 178 Vt. 35 (citing Cent. Vt. Hosp., Inc. v. Town of Berlin, 164 Vt. 456, 459 (1995)). Section 3-111(b)(1), enacted fifty years after the Declaratory Judgment Act, controls in this case because it specifically limits the parties in actions involving the use of common elements. The Association's motion for joinder is therefore denied.

## Order

Watson's motion to withdraw issues 8, 11, 12, and 13 of the amended complaint is granted. Those claims are dismissed with prejudice.

The Association's motion to dismiss is granted with regard to the 48-hour notice rule and the satellite dish rule, and denied with regard to the access easements, unit expansions, roof structures, and garage. The Association's motion for summary judgment is denied with regard to fence repair, obligation to record garage reallocation, and the redefinition of garages as limited common elements. Its motion for summary judgment is granted with regard to unit expansions;

35

removal of ceilings, joists, and roof trusses; access easements; and the temperature monitoring rule. Watson's motion for summary judgment is denied.

A status conference will be scheduled to discuss resolution of the remaining issues.

Dated at Burlington this 5th day of February, 2016.

_____
Helen M. Toor
Superior Court Judge